[No. H029713. Sixth Dist. Apr. 30, 2007.]

HUONG QUE, INC., et al., Plaintiffs and Respondents, v.
MUI LUU et al., Defendants and Appellants.

## COUNSEL

Hogan Holmes & Usoz, Thomas R. Hogan, Leslie Homes and Mark V. Boennighausen for Defendants and Appellants.

Robinson & Wood, Ann A. Nguyen and Joshua J. Borger for Plaintiffs and Respondents.

## OPINION

**RUSHING, P. J.**—Appellants Mui Luu and Cu Tu Nguyen challenge an order temporarily enjoining them from engaging in certain activities found by the trial court to constitute, among other things, tortious disloyalty to, and interference with the business of, plaintiffs Huong Que, Inc., and Con Tu. Appellants contend that the trial court erred in finding that plaintiffs were likely to succeed on the merits in several of their claims. We find no error, and affirm.

### BACKGROUND

Plaintiff Con is the president and sole owner of plaintiff Huong Que, Inc., a California corporation (Huong Que).[1] According to the complaint Huong Que is a "Vietnamese calendar distribution corporation" founded by appellants Nguyen and Luu, under whom it became, over 20 years, "the most well known, recognized and trusted brand name for traditional style Vietnamese calendars" known as " 'Bloc calendars.' " At the beginning of 2003, appellants—who are apparently husband and wife—sold the corporation to plaintiff Con under a written contract. In a portion of the contract entitled "Purchase and Sale," plaintiffs agreed to pay appellants $205,000 in three annual installments. In a section entitled "Compensation Agreement," plaintiffs agreed to pay bonus and "pension amount[s]" of $100,700 to appellant Nguyen and $161,750 to appellant Luu. In a section entitled "Management Agreement," appellants agreed to "act as Buyer's Managing Agents for a minimum period of four (4) years from January 1, 2003," during which time

---

[1] There is little need to distinguish between the two plaintiffs, to whom we will generally refer collectively as "plaintiffs." This is not to prejudge any issue that might require particularized distinctions between them, e.g., where one but not the other was the beneficiary of, or the party burdened by, a particular contractual undertaking.

they would "provide Buyer with business dealings, bookkeeping activities, and design of publishing samples." Plaintiffs undertook to pay appellants' expenses in rendering these services, including "air fares, transportation, lodging, and meal." They further agreed to pay $3,000 monthly to Luu, plus $1,150.74 monthly "to continue the current lease" of Nguyen's Mercedes Benz.

The "Purchase and Sale" section of the agreement included a paragraph entitled "Covenant not to Compete," which provided in its entirety, "Shareholders [i.e., appellants] shall not directly or indirectly, carry on or engage in, as an owner, the business of publishing services except for publishing Buddhist bible and book." The contract also included an integration clause, which stated, "This Agreement constitutes the entire agreement between Buyer, Shareholder [sic], and the Company concerning their rights and obligations with respect to the sale and purchase of the Shares. Any agreements or representations respecting the business or the sales of Shares to Buyer, that are not expressly set forth in this Agreement shall have no effect, except for a subsequent written modification signed by the party to be charged."

It is asserted by plaintiffs, and not disputed by appellants, that on May 23, 2005, plaintiffs discovered an e-mail message entitled "address list" in the electronic mailbox of appellant Luu.[2] The message constituted an apparent response by one Huan Nguyen to an earlier message from Luu in which she had written, "Please remember to email address list to me." His reply stated, "Attached are customers' addresses and meeting's report on 5/22/05. Please forward to other procalendar's members." Attached to the e-mail was a text file in Vietnamese, which plaintiffs later translated into English. Entitled "Minutes of meeting regard [sic] creation of PROCALENDAR," it called for the formation of a company using capitalization of $100,000 in five equal shares, of which two ($40,000) would be distributed to one Amy Khuu "c/o Mr. & Mrs. Nguyen Tu Cu,[3] Mr. Phan Don." The minutes set forth, among other things, the "responsibilities of each partner . . . ." As relevant here, they stated, "Mrs. Luu Mui will be responsible for bookkeeping, tax, contact with

---

[2] A Huong Que employee, Binh Tu, declared that when he first worked there the enterprise had no e-mail accounts for its employees, who therefore used their own accounts to conduct company business, including contacts with customers. Because appellant Luu "had limited knowledge of the internet and e-mail," she would often ask Tu to "help her log onto the Internet and log onto her e-mail account and help her check and send e-mail messages." Toward that end she gave him her user name and password. Beginning in 2004, he declared, appellants stopped actively attending to Huong Que business. He then began logging in to Luu's e-mail account using the user name and password she had given him, "to check for emails having to do with Huong Que business." This is how he discovered the message at issue.

[3] We infer that this was a reference to appellants. "Nguyen Tu Cu" is presumably the Vietnamese rendering of "Cu Tu Nguyen." Vietnamese naming conventions reverse the

Taiwan for calendar/book printing for customer, and distributing calendar for customer—no direct contact with customer, and no salary. [¶] . . . [¶] Mr. Cu[4] will be responsible for direct sales with Mr. Xanh, no salary."

Also attached to the e-mail, according to a declaration by plaintiff Con, was a document entitled "2001address.xls." This consisted of a list, as he declared, of "approximately 1000 names and addresses," of which he said "approximately ninety percent . . . are names and address on Huong Que's customer list."

On July 26, 2005, plaintiffs Con and Huong Que filed a complaint naming as defendants Nguyen and Luu, as well as one Don Phan, and two business entities: Pro Enterprise, LLC, described as a limited liability company, and Pro Calendar, "a business entity, form unknown." In later filings, appellants stated that Pro Enterprise, LLC, did business under the name of Pro Calendar. It appears that three additional individual defendants were later joined in the action: Thuy Nguyen, Huan Nguyen, and Hung Chun Tam. Appellants described Thuy Nguyen as a former "key employee" of Huong Que who, along with Hung Chun Tam, owned and operated Pro Calendar. These defendants, along with Don Phan and the two defendant business entities, appeared in the action separately from appellants. They referred to themselves below as the "Pro Calendar Defendants," and we shall do likewise.

In their complaint plaintiffs alleged, among other things, that in 2004, appellants "began to neglect their duties" as managing agents; that in March 2005, they stopped performing those duties entirely; and that they misappropriated Huong Que's customer list and used it to solicit business for Pro Calendar. They asserted causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the duty of trust and loyalty arising from appellants' positions as managing agents, misappropriation of a trade secret, i.e., Huong Que's customer list, and tortious interference with Huong Que's relations with its existing customers. Plaintiffs prayed for compensatory and punitive damages, and temporary and permanent injunctive relief.

Along with their complaint plaintiffs filed an ex parte application for an order temporarily restraining the named defendants, and requiring them to

European order, with family name followed by middle and then given name. (See Vietnamese Names, Things Asian <http://www.thingsasian.com/stories-photos/1044> [as of Apr. 30, 2007].)

[4] In Vietnamese the ordinary form of address, or at least formal address, is title followed by given name. Thus "Mr. Cu" presumably refers to appellant Cu Tu Nguyen. (See Vietnamese Names, Things Asian <http://www.thingsasian.com/stories-photos/1044> [as of Apr. 30, 2007].)

show why they should not be enjoined pending trial, from (1) engaging "as an owner" in "the business of publishing services" other than as expressly permitted by the purchase agreement; (2) "utilizing in any manner the Huong Que customer list"; (3) distributing catalogs offering Bloc calendars or photo calendars to customers on Huong Que's customer list; (4) soliciting business from customers on the list; (5) selling or distributing calendars to persons on the list; and (6) distributing calendars or anything resembling certain exhibits to the complaint.

The trial court issued a temporary restraining order and the matter came on for hearing on the preliminary injunction. In their opposition, appellants conceded that Pro Calendar had undertaken to represent a Taiwanese marketer of calendar products, and thus "compete[d] in the calendar distribution business." They also conceded that they had hosted a lunch at their home in May 2005 at which "the subject of Pro Calendar and its formation was discussed." But they "den[ied] any substantive involvement in these purported discussions" concerning Pro Calendar's formation, "and den[ied] . . . agree[ing] to the proposed role for them" as stated in the e-mailed minutes. They asserted that there was no evidence of an ownership interest by them in Pro Calendar as ultimately formed. They also conceded that Pro Calendar had mailed a catalog to prospective customers, but asserted, in arguably less than unequivocal language, that the list of recipients was derived independently of Huong Que's customer list. They contended that plaintiffs were not entitled to injunctive relief because they would be unable to prevail on their claims at a trial on the merits.

The trial court issued an order analyzing the issues and evidence at some length. The court found that "[t]he Luu Defendants do not have an ownership interest in the company;" i.e., Pro Calendar. However, they did engage in "substantive discussions" concerning its formation at their home on May 22, 2005, in which "a tentative agreement was reached in which most of the participants at this meeting would have ownership interests in Pro Calendar and would actively participate in the company in different roles." The court also found credible the averments in several declarations to the effect that appellant Nguyen "did in fact actively solicit Huong Que customers for Pro Calendar, a business entity that directly competed with Plaintiffs."

The court noted that a "central issue" before it had been what the customer list attached to the intercepted e-mail "actually consist[ed] of." The court found that a specified deposition exhibit containing 1,194 names and addresses was "a true and correct copy of the customer list attached to this email . . . ." The court found, "The great majority of customer names on this list are customers of Huong Que. Moreover, an extraordinary degree of customer information appearing on both the e-mail list and Huong Que's

customer list share the exact same mistakes and errors." The exhibit thus established, the court found, that appellants and three other individual defendants had appropriated Huong Que's customer list.

The court determined that plaintiffs were likely to prevail on most of their causes of action, and that they would be irreparably injured, and defendants unjustly enriched, if the latter were not prevented from distributing calendars and catalogs to customers on Huong Que's customer list Accordingly the court enjoined appellants, and some other defendants, from (1) using the Huong Que customer list; (2) distributing catalogs offering competing calendars to customers on the customer list; (3) soliciting business from customers on the list; and (4) selling competing calendars to customers on the list.

Appellants filed this timely appeal. The Pro Calendar defendants also appealed, but this court dismissed that appeal under former California Rules of Court, rule 17(a).

## DISCUSSION

### I. *Rule of Decision and Standard of Review*

■ The ultimate questions on a motion for a preliminary injunction are (1) whether the plaintiff is "likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant," and (2) whether there is "a reasonable probability that the plaintiffs will prevail on the merits." (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].) Here appellants do not contend that the trial court erred in connection with the first factor. Their challenge goes to the court's determination that plaintiffs were likely to prevail on the merits. For this approach to succeed, appellants must show that plaintiffs were unlikely to succeed on *any* cause of action that would support injunctive relief.

Such a challenge may trigger any or all of three standards of appellate review. Insofar as the court's ruling rests on evaluating and weighing the substantive factors noted above—the preponderance of likely injury and the likelihood of success—it is said to be vested in the discretion of the trial court, whose ruling will not be disturbed on appeal unless an abuse of discretion is made to appear. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463 [47 Cal.Rptr.3d 147].) Insofar as the trial court's ruling depends on determination of the applicable principles of law, however, it is subject to independent appellate review. (*Ibid.*; *Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1072 [48 Cal.Rptr.3d 614]; cf. *People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018 [27 Cal.Rptr.3d 596] ["Some cases define an error of law as an abuse of

discretion"].) And insofar as the court resolved disputed issues of fact, its findings are reviewed under the substantial evidence standard, i.e., they will be sustained unless shown to lack substantial evidentiary support. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1136–1137 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *Howard S. Wright Construction Co. v. Superior Court* (2003) 106 Cal.App.4th 314, 320 [130 Cal.Rptr.2d 641].)

Appellants betray a misunderstanding of the last-mentioned standard and its application on appeal when they assert that "the appellate court looks at the evidence that was presented to the trial court to determine if there was substantial evidence supporting the decision. [Citations.] In such a review, the appellate court must ensure that the trial court's express or implied factual determinations are supported by substantial evidence. [Citation.]" If appellants mean to suggest that we must independently search the evidentiary record to determine its sufficiency, they are mistaken. An appellate court " 'must *presume* that the record contains evidence to support every finding of fact . . . .' " (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881], italics added; see *Brown v. World Church* (1969) 272 Cal.App.2d 684, 690 [77 Cal.Rptr. 669] [" 'a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact' "].) It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. (*Brown v. World Church, supra*, 272 Cal.App.2d 684, 690.) This burden is a "daunting" one. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329 [249 Cal.Rptr. 798].) "A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.* [Citation.]" (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208 [249 Cal.Rptr. 743], italics added.) "[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect." (*Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 14–15 [304 P.2d 122].)

Appellants cite two cases on this point, but those decisions state only that a permanent injunction "must be supported by substantial evidence in the record" (*Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 964 [31 Cal.Rptr.3d 18]), and that findings of fact are reviewed " 'under a substantial evidence standard' " (*ibid.*, quoting *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631]). They do not state, as appellants assert, that the reviewing court "must ensure" that the trial court's findings "are supported by substantial evidence." An appellate court will consider the sufficiency of the evidence to support a given finding only

after a party tenders such an issue together with a fair summary of the evidence bearing on the challenged finding, particularly including evidence that arguably *supports* it.

As we have noted, the order before us must be affirmed if the trial court acted within its discretion, and properly applied the law, in assessing the likelihood of success on *any* cause of action. We find the court's determination to be free of demonstrated error with respect to at least two causes of action. For that reason we find it unnecessary to, and do not, address appellants' challenges to the remaining causes of action.

## II. Breach of Duty of Loyalty

### A. Introduction

■ Plaintiffs alleged in their complaint that defendants Nguyen and Luu, while employed by plaintiffs "in a position of trust and confidence" as managing agents, owed a duty of loyalty to plaintiffs, which they breached by, in essence, using their positions at Huong Que, and information acquired in those positions, to compete with it. The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach. (See *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101 [3 Cal.Rptr.2d 236].) The trial court's ruling necessarily implies that plaintiffs were likely to establish each of these elements to the satisfaction of a fact finder at trial. Appellants raise a host of points in derogation of that finding, which we will analyze under the elements to which they relate.

### B. Duty of Loyalty

Appellants' main challenge appears to be that no duty of loyalty can be imposed upon them without running afoul of the rights the parties voluntarily created in their contract. The argument is rather nebulous, but centers on the propositions that appellants had "limited duties" under the contract, the terms of which "should control the obligations between the parties." To fully evaluate this contention it is necessary to review the law of agency with respect to the duty of loyalty on which the present cause of action rests.

■ The duty of loyalty arises not from a contract but from a relationship—here, the relationship of principal and agent. Agency is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or

otherwise consents so to act." (Rest.3d Agency, § 1.01.) Where such a relationship arises, the agent assumes "a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." (*Id.*, § 8.01.)

■ While the creation of an agency relationship requires the assent of both parties, it does not require or depend on the law of contracts. "[T]he consensual aspect of agency does not mean that an enforceable contract underlies or accompanies each relation of agency. Many agents act or promise to act gratuitously. While *either acting as an agent or promising to do so creates an agency relation*, neither the promise to act gratuitously nor an act in response to the principal's request for gratuitous service creates an enforceable contract." (Rest.3d Agency, § 1.01, com. d, p. 21, italics added.)

■ Here there is ample evidence that appellants assented to act as agents for plaintiffs; after all, their agreement explicitly characterized them as such. They seem to suggest, however, that notwithstanding this agreement, to find them bound by a duty of loyalty, and particularly a duty not to compete, would conflict with the purchase contract's noncompetition clause, which only prohibited appellants from competing with plaintiffs "as an owner." There is no logical conflict between this prohibition and a recognition of a distinct, additional duty of loyalty arising from the parties' relationship. (See Civ. Code, § 3537 ["Superfluity does not vitiate"].)[5] Appellants imply, however, that the effect of the contractual provision was to *limit* any restriction on their right to compete, so that they were only forbidden to compete "as an owner." They thus appear to invoke, albeit tacitly, the maxim *expressio unius exclusio alterius est*, i.e., "mention of one matter implies the exclusion of all others." (*Steven v. Fidelity & Casualty Co.* (1963) 58 Cal.2d 862, 871 [27 Cal.Rptr. 172, 377 P.2d 284].) But that rule can only be invoked if a contract is ambiguous, in which case "other legal techniques for the resolution of ambiguities . . . also come into play," including the admission of extrinsic evidence "to prove the intent of the parties." (*Ibid.*)

■ We are directed to nothing on the face of the contract, and certainly to no extrinsic evidence, that would support the supposition that the parties intended to excuse appellants from the duty of loyalty otherwise flowing from

---

[5] The two duties would not be wholly duplicative of one another in any event. As agents or employees, appellants would presumably not be barred from *owning* part or all of a competing concern, so long as they refrained from acting disloyally toward plaintiffs. Working for Ford does not disable one from buying stock in General Motors. The contract provision, however, did have this effect. Also, the duty of loyalty flowing from the agency relationship would tend to exist only for the duration of the relationship, which was agreed to be four years. The contractual prohibition included no termination date and would therefore presumably persist for a reasonable time.

their agency relationship. On the contrary, the noncompetition clause appeared in a part of the contract concerning the provisions outlining the sale of the entity, under the heading "Purchase and Sale." This was followed by a section entitled "Compensation Agreement," reciting the sum due to each appellant as "bonus" and "pension amount." Appellants' undertaking to act for four years as "managing agents" appeared under the separate heading "Management Agreement." The noncompetition clause could readily be understood as intended not to affect appellants' duties as agents or employees, but only to obligate them as sellers. We cannot say that the trial court erred in failing to find that appellants' interpretation of the agreement was the one likely to prevail at trial.

■ Similar reasoning applies to appellants' oblique invocation of the parol evidence rule, which limits the ability of parties to an integrated written contract—i.e., one that appears intended to express the entire agreement—to claim that the writing is incomplete. (See Code Civ. Proc., § 1856.) Appellants note that the contract here contained a clause declaring it "the entire agreement" between the parties "concerning their rights and obligations with respect to the sale and purchase of the Shares." But as the last-quoted phrase seems to attest, this clause may itself be found ambiguous as it relates to the parties' rights and obligations under the "Management Agreement." Moreover, as noted above, appellants' own tacit reliance on the *expressio unius* maxim assumes the presence of contractual ambiguity. The parol evidence rule does not bar the admission of extrinsic evidence to resolve ambiguities in contract language. (Code Civ. Proc., § 1856, subds. (b), (g); *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913, fn. 4 [75 Cal.Rptr.2d 573].)

■ Appellants suggest that subjecting them to a duty of loyalty would offend the rule of *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350–351 [100 Cal.Rptr.2d 352, 8 P.3d 1089], which they cite for the proposition that "th[e] law does not countenance implied obligations which are not part and parcel of the written agreement." A more accurate statement would be that the law does not recognize implied *contract terms* that are *at variance* with the terms of the contract as expressly agreed or as prescribed by statute. As we have already observed, however, an agent's duty of loyalty arises not from any contract but from the parties' relationship. Many relationships give rise to duties that may be enforced even though the parties to the relationship have entered into a contract that makes no mention of those duties. Landlord and tenant, trustee and beneficiary, bailor and bailee—these and many other relationships generate rights and obligations quite independent of any contract the parties may sign. This does not make such duties inescapable. The parties may be able to modify or limit them by expressly agreeing to do so. But in the absence of such an agreement they are bound by them whether or not they allude to them in their contract.

The cited case is consistent with this deeply embedded tradition. Appellants overlook the court's ratification of the rule that all contracting parties, *whether they agree to it or not*, are bound by the implied-in-law covenant of good faith and fair dealing, which "prevent[s] one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." (*Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at p. 349, italics omitted.) Appellants refer instead to the court's holding that discharging an at-will employee without cause cannot constitute a breach of the covenant. But that holding rests on the rationale that such a discharge cannot frustrate any contractual expectation to which an at-will employee is entitled. (*Id.* at p. 350 ["Precisely because employment at will *allows* the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so"].) This reasoning depends on the statutory presumption of at-will employment, which *in the absence of an agreement to the contrary*, entitled the employer there to engage in the conduct asserted as a breach of covenant.

Here the presumption is reversed. In the absence of an agreement to the contrary, appellants, as agents, owed a duty of undivided loyalty, including a duty not to compete, to plaintiffs, their principals. (See 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency & Employment, § 100, p. 147 ["An agent or employee is under a duty not to compete with his or her principal on matters connected with the agency, unless the principal and the agent otherwise agree"].) Viewed through the lens of contract law, plaintiffs were entitled to consider this duty of loyalty an integral part of the relationship, just as a buyer expects an automobile to come with tires. If appellants wished to modify or delimit the duties imposed on them by law—to deliver a car without tires—it was incumbent upon them to make that modification or delimitation an express subject of the contract. They could not rely on the contract's silence to excuse them from the legal consequences of disloyalty to their principals.

Appellants assert that their employment agreement was "essentially . . . a consulting contract" and that they should not be burdened with a duty of loyalty merely because, in selling their business, they agreed to perform "simple post-sale consulting duties." This claim obliquely invokes the conception of an agent as one who *represents* the principal in dealings with others—which a true consultant, of course, does not. It is true that in a paradigmatic agency relationship, the agent undertakes or assents to act *for* the principal in relations with a third party. (Rest.3d Agency, § 1.01, com. c, pp. 18–21; see *ibid.*, quoting 1 Mechem, A Treatise on the Law of Agency (2d ed. 1914), § 27 ["It has been said that a relationship of agency always 'contemplates three parties—the principal, the agent, and the third party with whom the agent is to deal' "].) An agent may be distinguished in this respect from a "service provider [who] simply furnishes advice and does not interact

with third parties as the representative of the recipient of the advice . . . ." (Rest.3d Agency, § 1.01, com. c., p. 19.) The absence of a representative capacity, however, does not necessarily excuse such a provider from any duty of loyalty; an "adviser may be subject to a fiduciary duty of loyalty even when the adviser is not acting as an agent." (*Ibid.*)

Moreover *employees* are deemed agents for present purposes even if they are employed in a wholly nonrepresentative capacity. (Rest.3d Agency, § 1.01, com. c, pp. 19–20 ["The common law of agency . . . encompasses the employment relation, even as to employees whom an employer has not designated to contract on its behalf or otherwise to interact with parties external to the employer's organization"].) Thus an employee, while employed, owes undivided loyalty to his employer. (*Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 41 [241 Cal.Rptr. 539].) "While California law does permit an employee to seek other employment and even to make some 'preparations to compete' before resigning [citation], California law does not authorize an employee to transfer his loyalty to a competitor." (*Ibid.*) The duty of loyalty is breached, and the breach "may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer." (*Stokes v. Dole Nut Co.* (1995) 41 Cal.App.4th 285, 295 [48 Cal.Rptr.2d 673].) Indeed, by statute, "[a]n employee who has any business to transact on his own account, similar to that intrusted to him by his employer, shall always give the preference to the business of the employer." (Lab. Code, § 2863.)

Here the trial court may have been entitled to find that appellants would probably be found to have been hired as employees for purposes of these principles. Even if it was not, it could certainly find that they assented to and did act as agents in the core, representative sense of the term. They expressly agreed not only "to act as Buyer's *Managing Agents,*" but in doing so to "provide Buyer with *business dealings,* bookkeeping activities, and design of publishing samples." (Italics added.) There was ample evidence that the "business dealings" thus undertaken included representing Huong Que in its interactions with customers and service providers. Thus plaintiff Con declared that appellant Nguyen participated in "sales trips" on Huong Que's behalf. Huong Que employee Binh Tu declared that when he accompanied Nguyen on a 2002 sales trip, Nguyen "introduced me to the customers" and "taught me about his sales techniques and taking calendar orders from customers." In 2003, after the sale of Huong Que, the declarant again accompanied Nguyen on the "yearly interstate sales trip." In 2004, Nguyen "postponed this sales trip for a week." Meanwhile, Binh Tu declared, it was appellant Luu's duty "to deal directly with the printer and the printing company." By the end of 2004, he said, appellants were "refus[ing] to cooperate in contacting the printer and photographers and dealing with customers and conducting sales." The court thus found that appellants not only assented to be described as

"agents," but actually represented (and then refused to represent) plaintiffs in dealings with third persons.

■ Appellants suggest that the "compensation level" they received as managing agents militates against a finding that they were burdened with a duty of loyalty to plaintiffs. No authority is cited for this proposition. As previously noted, one becomes an agent, and thereby assumes a duty of loyalty, by acting or assenting to act for another—even if *no* consideration is furnished and no contract is formed. (See Rest.3d Agency, § 1.01, com. d.) Further, even if the issue were one of contract law we fail to see how the amount of appellants' compensation would affect the outcome. To be enforceable as a contract, a promise undoubtedly requires consideration (Civ. Code, § 1550, subd. (4)), or a substitute such as promissory estoppel (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 7 [151 Cal.Rptr. 323, 587 P.2d 1136]). But as every first-year law student is told, the *quantum* of consideration is generally irrelevant "as long as it has some value." (*A. J. Industries, Inc. v. Ver Halen* (1977) 75 Cal.App.3d 751, 761 [142 Cal.Rptr. 383]; see *Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 369, fn. 7 [111 Cal.Rptr. 468] ["There is no requirement that consideration be adequate to make a contract enforceable at law"]; cf. Civ. Code, § 3391, subd. (1) [*specific performance* is not available unless the defendant "received an adequate consideration for the contract"].)

Here there is no claim that appellants' undertaking to act as agents for Huong Que was wholly unsupported by consideration. Nor does the record suggest any basis for such a claim. The employment provisions of the agreement granted Luu $3,000 per month for four years, or $144,000, while Nguyen would receive $1,150.74 per month for an unspecified time. These payments came in addition to the $205,000 received by appellants as sellers of the business and the $262,450 in bonuses and "pension amount[s]." Thus, even if the adequacy of compensation had some bearing on the existence of a duty of loyalty, we would see no basis to overturn the trial court's finding, which we would be required to infer in support of the judgment, that the compensation is likely to be found adequate.

Appellants imply that their status as "prior owners" distinguishes them from the agents and employees held subject to a duty of loyalty in other cases. If that were their only relationship to plaintiffs they would surely have a point. But in addition to selling their business, they voluntarily assumed a relationship to plaintiffs as "managing agents." Nor are they aided by the suggestion that they were "non-executive employees." They assert that where such employees are concerned, a duty of loyalty "generally only arise[s] as a defense to a wrongful termination claim, not an affirmative claim." In the one case they cite, this court held that an employee's breach of the duty of loyalty

furnished good cause for his discharge. (*Fowler v. Varian Associates, supra,* 196 Cal.App.3d at p. 41.) But we never suggested that such a breach could only be asserted in defense. Indeed we cited another case for its recognition that a corporate officer's disloyalty could sustain a claim for damages. (*Id.* at p. 42, citing *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 346 [49 Cal.Rptr. 825, 411 P.2d 921].) Another decision appears to expressly contradict appellants' assertion. (*Stokes v. Dole Nut Co., supra,* 41 Cal.App.4th at p. 295 ["The duty of loyalty is breached, *and may give rise to a cause of action in the employer,* when the employee takes action which is inimical to the best interests of the employer" (italics added)].) Moreover, the present record does not permit us to adopt, in derogation of the judgment, appellants' factual premise, i.e., that despite their express undertaking to act as "*managing* agents" they were (or were likely to be found to be) "non-executive employees."

We have no doubt that the trial court acted correctly in determining that plaintiffs were likely to succeed in establishing that appellants owed them a duty of loyalty.

### C. *Breach of Duty*

The duty of loyalty embraces several subsidiary obligations, including the duty "to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors" (Rest.3d Agency, § 8.04), the duty "not to acquire a material benefit from a third party in connection with . . . actions taken . . . through the agent's use of the agent's position" (*id.,* § 8.02), and the duty "not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party" (*id.,* § 8.05(2)).

Plaintiffs alleged that appellants breached one or more of these duties by "secretly organizing a competing business, utilizing confidential information acquired during the course of their employment by plaintiffs, and informing customers of Huong Que that Huong Que had changed owners and was now operating under the name Pro Calendar." The trial court ruled that plaintiffs were likely to succeed at showing that appellants "appropriate[d] Huong Que's customer list, covertly [met] with other Defendants to plan the formation of Pro Calendar . . . , and steer[ed] away Huong Que's customers to Pro Calendar." In connection with another cause of action the court observed that appellants "assisted in promoting Pro Calendar by doing such things as knowingly and intentionally soliciting business from plaintiffs' customers." The court expressly found "credible" the averments by plaintiffs' witnesses "that Defendant Cu Tu Nguyen, while he was still a Managing Agent of Huong Que, did in fact actively solicit Huong Que customers for Pro Calendar, a business that directly competed with Plaintiffs."

Appellants assert that they were entitled "to meet with other individuals to discuss the formation of a new business," and to "discuss creating a new business that might compete with an employer." This is true as far as it goes; "California law . . . permit[s] an employee to seek other employment and even to make some 'preparations to compete' before resigning . . . ." (*Fowler v. Varian Associates, Inc., supra,* 196 Cal.App.3d at p. 41.) But assuming this might shield an agent from liability based on helping to form a competitive business, that was only one of the several breaches of loyalty that plaintiffs alleged and the trial court found likely to be established at trial. Assuming appellants were entitled to participate in the formation of Pro Calendar and to plan eventual employment with that entity, they would still breach a duty of loyalty by diverting plaintiffs' customers to Pro Calendar while ostensibly remaining plaintiffs' employees or agents.

### D. *Damage*

Appellants do not separately challenge the necessary finding that plaintiffs could probably establish the third element of the tort, i.e., damage proximately caused by the breach of the duty of loyalty. It appears, however, that their argument on that point in connection with the cause of action for tortious interference with advantage would apply with equal force to their breach-of-loyalty claim. We therefore turn to that argument.

### III. *Tortious Interference with Advantage*

The court found plaintiffs likely to prevail on their claim of interference with prospective economic advantage. It ruled that plaintiffs' relations with Huong Que customers "represented the probability of future economic rewards" to them, and that appellants knew of those relationships and intentionally interfered with them by "wrongfully appropriating and exploiting Huong Que's confidential, proprietary and trade secret information and soliciting those clients for their own benefit." It concluded that plaintiffs had suffered economic harm as a result.

Appellants' sole attack on these findings is that, at the time of the hearing on the preliminary injunction, plaintiffs were unable to *quantify* the harm caused by defendants' interference with their relations with their customers. They state that Tuan Ngo, who was designated by Huong Que as its "person most knowledgeable" on relevant matters (see Code Civ. Proc., § 2025.230), testified that (1) he thought Huong Que had lost 50 customers since its purchase by plaintiff Con, but could not say whether these losses were due to conduct by defendants; (2) until the end of the sales season, it would not be possible to determine any losses from the misuse of Huong Que's customer list; (3) he had not calculated in writing the extra time Huong Que was forced

to expend per customer as a result of Pro Calendar issues. From this appellants conclude that "[t]he person most knowledgeable about the business enterprise was not able to articulate any direct loss as a result of anything the Appellants may have done."

■ This argument fails for at least two reasons. First, it treats the matter before the court as a claim for damages, when for present purposes it is properly viewed as one for injunctive relief. As such its orientation is prospective, not retrospective. If a plaintiff can show that defendant's conduct threatens him with unlawful injury, his inability to *quantify* the harm already suffered, or likely to be suffered, is not a ground for denying injunctive relief. On the contrary, "extreme[] difficult[y]" in ascertaining damages is a factor *favoring* injunctive relief. (Code Civ. Proc., § 526, subd. (a)(5); Civ. Code, § 3422, subd. (2).) Appellants' argument assumes that all the elements of a damage claim are present except *quantifiable* harm. This is an argument *for* an injunction, not against it.

■ Second, the question before the trial court was not whether plaintiffs could calculate their damages at the time of the ruling on the preliminary injunction, but whether they were likely to be able to do so at trial. The fact that a party is not prepared to provide a precise calculation of damages at a preliminary stage of litigation does not preclude a court from determining that the party will be able, at trial, to prove damages with sufficient certainty to support compensatory relief. As indicated in part I, above, the trial court's finding that plaintiffs would probably succeed on this issue cannot be overturned on appeal simply because there was evidence that might support a contrary determination. The very testimony cited by appellants indicates that a more certain assessment of plaintiffs' injuries could be made at the end of the selling season. The trial court presumptively credited this testimony. We see no reason to doubt its sufficiency to support the court's finding on the larger issue.

Since appellants offer no other reason to overturn the determination that plaintiffs were likely to succeed on the tortious interference claim, that determination must be sustained on appeal.

As previously noted, it is unnecessary to determine whether the trial court correctly forecast probable success on *all* causes of action. We have concluded that the court's ruling was free of error with respect to two causes of action. That is enough to sustain the order under review.

## Disposition

The order granting plaintiffs' application for a preliminary injunction is affirmed.

Premo, J., and Elia, J., concurred.