Filed 7/21/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF SAN JOSE,<br><br>    Plaintiff, Cross-defendant, and Respondent,<br><br>v.<br><br>MEDIMARTS, INC. et al.,<br><br>    Defendants, Cross-complainants, and Appellants. | H042481<br>(Santa Clara County<br>Super. Ct. No. CV272374) |

The City of San Jose brought this action to collect unpaid business taxes from defendants MediMarts, Inc. and its president, David Armstrong. In the course of the proceedings defendants sought a preliminary injunction against the City's attempts to stop them from operating their medical marijuana collective. On appeal, defendants contend that payment of the Marijuana Business Tax (San Jose Municipal Code, § 4.66.010 et seq.) would force Armstrong to incriminate himself in violation of his Fifth Amendment privilege by admitting criminal liability for violating federal drug laws. We conclude that the privilege against self-incrimination has no application in these circumstances. We must therefore affirm the order.

*Background*

MediMarts was established in 2009 as a nonprofit collective under the name Bay Pacific Care, Inc. Bay Pacific Care paid the Marijuana Business Tax (hereafter, MBT) from March 2011 through July 2011. In August 2011 the collective changed its name to MediMarts, and it continued paying the tax through April 2012. In May of 2012,

however, MediMarts discontinued paying the MBT, instead submitting tax returns showing no money due. The City began sending tax assessments and overdue notices, while Armstrong maintained that the tax itself was illegal under federal law. After a hearing before the Acting Director of Finance, MediMarts was found to owe $58,788.53 as of August 24, 2012, along with the future accrual of penalties and interest. Armstrong continued to protest the assessments to Wendy J. Sollazzi, a revenue management division manager in the City's finance department. Another hearing took place on November 15, 2013. On July 11, 2014, the Director of Finance found that MediMarts owed $215,111.17 as of the November 2013 hearing date.

The City then brought this action against Armstrong and MediMarts to collect the unpaid business taxes due under the MBT, chapter 4.66 of the San Jose Municipal Code (hereafter, SJMC or the Code). In its first amended complaint, filed December 3, 2014, it alleged that defendants were subject to the MBT and that by failing to pay the tax they had incurred collection costs, interest, and penalties. The complaint specifically alleged that Armstrong "was an agent of [MediMarts] acting in the scope of such agency and with the permission and consent of [MediMarts]." Together the taxes, interest, and penalties claimed by the City totaled $767,058.60 as of October 10, 2014.

Defendants answered the complaint and filed a cross-complaint under 42 U.S.C. sections 1983 and 1988. In this pleading they alleged that payment of the MBT "would subject [d]efendants to self incrimination," because the law "forces [defendants] to admit to the sale or possession for sale of marijuana." The tax also violated defendants' due process rights by failing to provide for notice or a hearing before declaring MediMarts a nuisance and by forcing it to cease operations. Armstrong specifically was denied due process because he was not afforded a hearing "on whether he should be personally liable for the taxes of [MediMarts]." Finally, the cross-complaint alleged a violation of defendants' equal protection rights under the Fourteenth Amendment, because the MBT "unjustly treats collectives and medical marijuana patients differently from other

2

similarly situated individuals and organizations." Defendants sought damages as well as a "judicial determination as to whether: [(]1) the MBT is due and payable; [and] [(]2) . . . the MBT violates Cross-Complainants['] constitutional rights."

Defendants then applied for a preliminary injunction to restrain the City from taking any action to shut down the collective or declare it a nuisance, to compel the City to reinstate MediMarts's business registration, and to require the City to remove its classification of MediMarts as a nuisance per se during the pendency of the action. Defendants cited the same grounds as in their cross-complaint and predicted "great and irreparable injury" from the closing of MediMarts, not only to the collective but also to the patient members who needed the medical marijuana to cope with their illnesses. MediMarts as well as Armstrong could assert the Fifth Amendment here, they argued, because it functioned "only to serve its member-patients"; that is, it existed not merely as an organization, but as a collective of members who were all acting in their own personal interest and on behalf of all members. Like the other members, Armstrong himself could assert the Fifth Amendment because he was "not acting solely as a representative [of MediMarts] but was "always acting in a partially personal capacity." Defendants also argued that the MBT was unconstitutionally vague and overbroad.

The superior court was not persuaded. Applying the "collective entity rule," the court determined that neither MediMarts nor Armstrong was entitled to assert the Fifth Amendment to resist the tax. (See *Braswell v. United States* (1988) 487 U.S. 99, 104-113 (*Braswell*).) The court rejected the argument as to MediMarts that it existed "only to serve its member--patients"; it was nonetheless a separate incorporated legal entity "with all the powers, benefits and responsibilities accorded to it by law." Armstrong's claim that he could invoke the Fifth Amendment because he was not acting solely as a representative of the collective was also deemed unavailing. From the court's June 15, 2015 order, defendants filed this timely appeal.

3

*Discussion*

1. *Legislative Framework*

The Compassionate Use Act of 1996 (CUA), passed by Proposition 215 in November 1996, added section 11362.5 to the Health and Safety Code. It provides a defense to prosecution for possession and cultivation of marijuana, which are otherwise prohibited by sections 11357 and 11358, respectively, of that code. In 2004 the Medical Marijuana Program (MMP) (Stats. 2003, ch. 875, § 2, p. 6424) took effect, providing additional protection from specified criminal statutes for qualified patients, persons holding authorized identification cards, and primary caregivers. (Health & Saf. Code, § 11362.765.) Section 11362.775 of the program exempts from the same criminal statutes "qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate cannabis for medical purposes." (Stats. 2003, ch. 875, § 2, p. 6424; see amendment in Stats. 2015, ch. 689, § 6, pp. 5319-5320 eff. Jan. 1, 2016 (A.B. 266).) MediMarts operates as such a collective authorized under the MMP.

Federal law, however, continues to prohibit possession, cultivation, and distribution of marijuana notwithstanding modifications of drug laws in individual states. Under the Controlled Substances Act (CSA), title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801, et seq.), it remains unlawful to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the CSA. (21 U.S.C. §§ 841(a)(1), 844(a); see *Gonzales v. Raich* (2005) 545 U.S. 1, 12 (*Gonzalez*).) Marijuana is listed as a Schedule 1 controlled substance. (21 U.S.C. § 812, subd. (c)(10).) There is no exception under federal law for medical use. (21 U.S.C. §§ 812, 844(a)); see *United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 491-495 [medical necessity defense unavailable under

4

the CSA]; *Gonzales*, *supra*, at pp. 27-29 [Congress may, under the Commerce Clause, regulate cultivation and use of marijuana authorized by the CUA].)[1]

The CSA has not, however, been held to preempt the CUA. Indeed, both Congress and the United States Supreme Court have indicated otherwise, as have our state's appellate courts. (See 21 U.S.C. § 903; see *Gonzales v. Oregon* (2006) 546 U.S. 243, 251 [preemption provision of the CSA, 21 U.S.C. § 903,[2] "explicitly contemplates a role for the States in regulating controlled substances"]; see also *City of Garden Grove v. Superior Court* (2007) 157 Cal.App.4th 355, 383-385 [CUA does not undermine the stated objectives of the CSA and is not preempted by it]; *Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 963 [neither conflict preemption nor obstacle preemption precludes application of the CUA and MMP through the CSA, citing rejection of preemption arguments in *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 757-763]; accord, *City of Palm Springs v. Luna Crest Inc.* (2016) 245 Cal.App.4th 879, 884-886 [city's issuance of permits for medical marijuana dispensaries is not a regulation preempted by federal drug laws].)

---

[1] In recent years the stringency of the CSA has been mitigated with respect to medical marijuana by section 538 of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. No. 113-235, (December 16, 2014) 128 Stat. 2130) and section 542 of the "Consolidated Appropriations Act, 2016" (Pub. L. No. 114-113, (December 18, 2015) 129 Stat. 2242.) Under those provisions, funds made available to the Department of Justice may not be used to prevent named states (including California) from "implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Notwithstanding this policy, section 809 of each legislative act clarifies that federal funds authorized by the act may not be used to legalize or reduce penalties associated with possession, use, or distribution of schedule 1 substances proscribed by the CSA.

[2] 21 U.S.C. section 903 states: "No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together."

5

San Jose began taxing marijuana businesses following the adoption of Measure U in the November 2, 2010 election. Measure U authorized the enactment of chapter 4.66 of the SJMC, thereby establishing the MBT. The chapter requires anyone engaged in a marijuana business[3] to pay up to 10 percent of its gross receipts to the City. (SJMC, § 4.66.250.) SJMC's section 4.66.010 states that the purpose of the provision is "solely" to raise revenue for the City "and is not intended for regulation." A person who fails to pay the tax when due incurs a 25 percent penalty, with an additional 25 percent penalty imposed after one month's delinquency. (SJMC, § 4.66.300.) Operation of a marijuana business without a business tax certificate is deemed unlawful, and the certificate will not be issued unless the tax has been paid. (SJMC, § 4.66.210(B).) The Code also imposes personal liability for the tax, penalties, and interest on any person (including an officer or employee of a corporation) who is required to "collect, truthfully account for, and pay over any tax imposed by this code," but who willfully fails to do so or attempts "to evade or defeat any such tax or payment thereof."[4] (SJMC § 1.08.015.5.) The City cited this provision both in its complaint and in its opposition to defendants' injunction request.

2. *The Preliminary Injunction*

When presented with defendants' application for a preliminary injunction, the superior court had two factors to consider: (1) the likelihood that defendants would

---

[3] A marijuana business is defined to encompass the activities of "planting, cultivating, harvesting, transporting, manufacturing, compounding, converting, processing, preparing, storing, packaging, wholesale, and/or retail sales of marijuana and any ancillary products in the City, whether or not carried on for gain or profit." (SJMC, § 4.66.110)

[4] This section states: "In addition to all other remedies provided by law, any person required to collect, truthfully account for, and pay over any tax imposed by this [C]ode who willfully fails to collect such tax , or truthfully account for and pay over such tax or willfully attempts in any manner to evade or defeat any such tax or payment thereof, shall be personally liable for the total amount of the unpaid tax and interest and penalties on the unpaid tax evaded or not collected or not accounted for and paid over to the city." (SJMC § 1.08.015.5.)

ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction.  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 441-442.)  Because the decision whether to grant a preliminary injunction rests in the sound discretion of the trial court, we generally review that decision for abuse of discretion.  (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495, quoting *Salazar v. Eastin* (1995) 9 Cal.4th 836, 849-850.)  It is defendants' burden to make a clear showing of such abuse.  (*Ryland Mews Homeowners Assn. v. Munoz* (2015) 234 Cal.App.4th 705, 711.)  However, to the extent that a trial court's grant or denial of a preliminary injunction and its assessment of the likelihood of success on the merits depend on legal rather than factual questions, we review that decision independently.  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 408; *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463.)

3. *Viability of Armstrong's Defense to Payment of the MBT*

Recognizing that MediMarts, a corporate entity, has no constitutional right against self-incrimination, in seeking reversal defendants assert the Fifth Amendment only as to Armstrong.  (See *Hale v. Henkel* (1906) 201 U.S. 43, 75 (*Hale*) [corporation is not a "person" for purposes of the privilege against self-incrimination], overruled in part on other grounds in *Murphy v. Waterfront Comm'n.* (1964) 378 U.S. 52; *United States v. White* (1944) 322 U.S. 694, 699 ["Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation."].)  This constitutional provision declares that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  As the text has been interpreted, "a communication must be testimonial, incriminating, and compelled." (*Hiibel v. Sixth Judicial Dist. Court of Nev. Humboldt Cty.* (2004) 542 U.S. 177, 189.) In particular, "[t]he word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character." (*United States v. Hubbell* (2000) 530 U.S. 27, 34; see also *Hale, supra*, at p. 67 [the

7

"interdiction of the 5th Amendment operates only where a witness is asked to . . . give testimony which may possibly expose him to a criminal charge"].)  The act of filing a tax return has not been considered testimonial.  (See *Hubbell*, *supra*, at p. 35; *United States v. Sullivan* (1927) 274 U.S. 259, 263 [Fifth Amendment did not exempt defendant from paying taxes or filing a return for income derived from unlawful business].)

The City did not focus on the testimonial aspect of the privilege, but relied primarily on the "collective entity" doctrine, which was also the primary basis of the superior court's order.  The underlying principle of this doctrine, as repeatedly explained by the United States Supreme Court, is that a corporate officer may not rely on the Fifth Amendment when required to produce the records of the corporation.  For example, in *Hale*, *supra*, 201 U.S. at 76, the United States Supreme Court rejected a corporate officer's reliance on the Fifth Amendment when, though given personal immunity, he was required by a grand jury to answer questions and produce material demanded in a subpoena.  In *Wilson v. United States* (1911) 221 U.S. 361 the president of a corporation unsuccessfully challenged a contempt order after he refused to produce subpoenaed corporate records.  The president "could assert no *personal* right to retain the corporate books against any demand of government which the corporation was bound to recognize." (*Id*. at p. 385, italics added; see also *Dreier v. United States* (1911) 221 U.S. 394, 400 [corporate secretary properly found in contempt for refusing demand for corporate documents, notwithstanding his claim that those papers would tend to incriminate him].)

As the high court subsequently made clear, "representatives of a collective entity act as agents, and the official records of the organization that are held by them in a representative rather than a personal capacity cannot be the subject of their personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally . . . Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation, which possesses no

8

such privilege." (*Braswell*, *supra*, 487 U.S. at pp. 99-100.) Thus, while business records of a sole proprietor or practitioner may be protected from release by the Fifth Amendment, an individual "cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." (*Bellis v. United States* (1974) 417 U.S. 85, 93-101 (*Bellis*).)

Defendants maintain that the collective entity doctrine is inapplicable to divest Armstrong of his own Fifth Amendment rights. They seek to avoid the corporate-individual distinction by characterizing the issue without regard to MediMarts's corporate identity, asserting that "a person cannot be compelled to provide evidence of their [*sic*] own illegal conduct." Defendants refer to the tax as one "imposed on the money *he* [i.e., Armstrong] received each month from the sale of marijuana." (Italics added.) But the tax is not the obligation of Armstrong; it belongs to MediMarts. It makes no difference that the complaint accuses both defendants of failing to pay the MBT; it is MediMarts that owed the tax. Armstrong's duty to collect and turn over the tax inhered in his *representative* capacity as president of the collective. His signature on the tax returns that were filed in 2011 and 2012 properly reflected that duty, as he signed on behalf of MediMarts, not himself.

Nor can defendants escape the core principle of the collective entity doctrine by pointing out that the cases illustrating it pertained to production of subpoenaed documents. The point to be drawn from this abundant precedent is that a corporate officer, even a president (such as Armstrong), cannot avoid an obligation imposed by the government *on the entity* by asserting the Fifth Amendment on his own behalf.

Defendants' production of an excerpt from *Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704 does not advance their position. In *Spielbauer*, a deputy public defender was being investigated by his county employer over allegations that he had made deceptive statements to the court while representing a criminal defendant. When

9

interviewed by the supervising attorney, Spielbauer was informed that his refusal to cooperate would be deemed insubordination which could subject him to termination, but he was assured that his answers could not be used in a criminal proceeding. Spielbauer, however, invoked his privilege against self-incrimination and was thereafter terminated by the county for failing to answer the questions posed by the investigator. Our Supreme Court upheld the termination. It explained that the protection afforded the individual by the Fifth Amendment is not against a nonpenal use, but against only the government's use in a criminal proceeding. (*Spielbauer*, *supra*, at p. 715.) Thus, "the right against self-incrimination is not itself violated until statements obtained by compulsion are *used* in criminal proceedings against the person from whom the statements were obtained." (*Id*. at p. 727.) The employer was entitled to discipline or even dismiss the employee who refuses to answer job-related questions, "so long as the employee is not required, as a condition of remaining in the job, to *surrender* his or her right against criminal use of the statements thus obtained." (*Id*. at pp. 725.) Only if compelled statements are used in criminal proceedings against the person from whom the admissions of wrongdoing are elicited does the Fifth Amendment come into play. (*Id*. at p. 727.)

None of the decisions applying the Fifth Amendment to tax payments is helpful either. Each of the cited cases involved an *individual* who successfully obtained reversal of his conviction for tax evasion, where his defense was that payment of the tax would expose him to prosecution for illegal "wagering." (See *Marchetti v. United States* (1968) 390 U.S. 39 (*Marchetti*) [evasion of occupational tax in business of accepting wagers]; *Grosso v. United States* (1968) 390 U.S. 62 (*Grosso* ) [failure to pay excise and occupational taxes on wagering proceeds]; see also *Leary v. United States* (1969) 395 U.S. 6, 29 [transportation of marijuana without paying transfer tax].) Moreover, in each case it appeared that the challenged tax was directed to a group suspected of criminal activity. (Cf. *Marchetti*, *supra*, at p. 57 [tax directed at " 'selective group inherently suspect of criminal activities' "]; *Grosso*, *supra*, at p. 65-67 [same]; *Leary*, *supra*, at p. 18

10

[same].)  In this case, by contrast, it is a corporation, not an individual, that is required to pay the tax; the tax is imposed on legitimate businesses, not on those engaged in activity prohibited by the state or City; and it is not directed at a "selective and suspect group" but is a *noncriminal* measure with an express purpose solely of raising revenue. (*Leary*, *supra*, at p. 18.)  Filing the tax return itself is no more offensive to the Fifth Amendment than requiring a motorist involved in an accident to stop and provide his or her name and address (Veh. Code, § 20002, subd. (a)(1)); such requirements, too, have essentially regulatory, noncriminal purposes, and compliance is neither testimonial nor, by itself, incriminating.  (*California v. Byers* (1971) 402 U.S. 424.  Even viewing defendants' business as potentially liable under *federal* law such as the CSA, any assumption that Armstrong will be subject to prosecution would be speculative and premature, as no criminal proceeding has yet been initiated for his privilege to come to the foreground. (Nor is it likely to, given Congress's recently repeated admonition to the Justice Department not to interfere with states' authorization of medical marijuana.[5])

We thus conclude, as did the superior court, that there is no likelihood that defendants will ultimately prevail in the City's action against them or on their cross-complaint.  Were we to endorse Armstrong's position, we would only compromise the firm stance of our courts that "an individual acting in his official capacity on behalf of [an] organization may . . . not take advantage of his personal privilege.  In view of the inescapable fact that an artificial entity can only act to produce its records [or pay its taxes] through its individual officers or agents, recognition of the individual's claim of privilege . . . would substantially undermine the unchallenged rule that the organization itself is not entitled to claim any Fifth Amendment privilege, and largely frustrate legitimate governmental regulation of such organizations." (*Bellis*, *supra*, 417 U.S. at p. 90; *Braswell*, *supra*, 487 U.S. at pp. 108-112 [Fifth Amendment objection to subpoena

---

[5] See fn. 1, ante.

11

of corporate records unavailable to custodian even if producing them may prove personally incriminating].)

Finally, even if we were to agree with defendants that paying the MBT would encroach on Armstrong's Fifth Amendment privilege against self-incrimination, it would not afford defendants the relief they seek. The injunction application sought to prevent the City from shutting down the operation of MediMarts, disqualifying MediMarts from renewing its registration, and declaring it a public nuisance. Defendants also asked the court to require the City, while the action was pending, to reinstate MediMarts's business registration and remove its classification of MediMarts as a nuisance per se. As discussed above, neither the assertion of Armstrong's constitutional rights nor the accommodation of them would abate *MediMarts's* duty to pay the tax under SJMC chapter 4.66. The superior court properly denied the application for a preliminary injunction.

*Disposition*

The order is affirmed.

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

MIHARA, J.


*City of San Jose v. Medimarts, Inc. et al.*
H042481

Trial Court:                                          Santa Clara County Superior Court
                                                     Superior Court No.:  CV-272374


Trial Judge:                                         Honorable Maureen A. Folan


Counsel for Plaintiff, Cross-defendant              Richard Doyle, City Attorney
and Respondent:                                     Nora Frimann, Assistant City Attorney
CITY OF SAN JOSE.                                   Margo Laskowska, Deputy, City Attorney
                                                    Kendra E. McGee-Davies, Deputy City Attorney
                                                    Mark J. Vanni, Deputy City Attorney
                                                    Office of the City Attorney



Counsel for Defendants,                             Nicholas G. Emanuel
Cross-complainants and Appellants:                  Gates Eisenhart Dawson
MEDIMARTS, INC. et al.