Filed 7/25/25; Certified for Publication 8/25/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALLISON BJOIN, Individually and as Personal Representative, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> J-M MANUFACTURING COMPANY, INC., <br><br> Defendant and Respondent. | B335334 <br><br> (Los Angeles County Super. Ct. No. 21STCV30709) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Graciela Freixes, Judge.  Affirmed.

Weitz & Luxenberg, Benno Ashrafi and Josiah Parker for Plaintiff and Appellant.

Manning Gross & Massenburg (MG+M), Carrie S. Lin; Miller Barondess, Nadia A. Sarkis, James Nikraftar; Lewis Brisbois Bisgaard & Smith, Jeff A. Miller and Florence A. McClain for Defendant and Respondent.

_____

After being diagnosed with lung cancer, Kirt Bjoin (Bjoin) and his wife Allison brought this action against J-M Manufacturing Company, Inc. (JMM) and others, alleging that Bjoin's cancer was caused by dust created when he cut JMM's asbestos cement pipe (AC pipe) with a power saw in the 1980's. A jury found in favor of JMM on effectively all causes of action. The jury specifically found in favor of JMM on its sophisticated user and product misuse affirmative defenses, which were defenses to his causes of action for failure to warn and design defect. The jury also found in favor of JMM on Bjoin's cause of action for general negligence.

Bjoin appeals from the judgment entered after trial. He contends the evidence is insufficient to support the jury's findings on the two affirmative defenses and therefore necessarily insufficient to support the negligence verdict. The burden of proving insufficient evidence to support a jury verdict is extremely high, and Bjoin has not met it.

Bjoin also contends the trial court erred in permitting JMM to offer evidence of the California Occupational Safety and Health Administration (Cal-OSHA) regulations in place during the time Bjoin was working with AC pipe. He has waived this claim by failing to provide the appropriate legal standard of review and cogent argument explaining how he was prejudiced by this evidence. He further contends the trial court erred in granting nonsuit on his cause of action for fraudulent concealment. Although we do not agree with the rationale of the trial court's order, we find the ruling correct. We affirm the judgment.

# BACKGROUND

When Bjoin was about 10 years old, his parents divorced. He spent summers with his father H. Bjoin in Southern California. Bjoin worked for his father informally until 1977, when he was about 16 years old. Beginning in the summer of 1977, Bjoin went to went for his father's company, then called Frontier Constructors. The company did sewer, water and drain work. Bjoin began laying pipe that summer. Bjoin again worked for his father's company in the summer of 1978.

Bjoin graduated from high school in 1979 and began attending the University of Montana. He quit college in 1981 for financial reasons and went to work full-time for his father's company, then called H.A. Bjoin & Sons (Bjoin & Sons). As early as 1981, Bjoin cut AC pipe and did so with a power saw.

At some point after Bjoin started working for Bjoin & Sons, Bjoin's father simply disappeared one day. Testimony about the year varies. Bjoin's Social Security statement shows full-time income from Bjoin & Sons for 1982 but does not reflect any income at all for 1983. Bjoin testified this was the period when he continued to work on projects for Bjoin & Sons; he was paid in cash under the table by the clients. When asked why he took it upon himself to continue the business after his father left, Bjoin testified that his father left all his equipment and there were jobs he could finish, "[s]o it seemed like the best thing to do at that time was just try to pick it up and see if we can make it work, Bill [Bevilacqua] and I."

Around the same time, in 1983, Johns-Manville underwent a corporate restructuring. JMM and its sister company J-M/AC were founded to purchase Johns-Manville's former pipe division, including its former AC and PVC pipe businesses; Johns-

3

Manville later went out of business due to asbestos injury lawsuits. Under this arrangement, J-M/AC manufactured AC pipe, while JMM was the exclusive supplier of the pipe. JMM was also responsible for health and safety at both companies. This founding in 1983 marks the beginning of JMM's liability in this action.

In October 1984, Bjoin and Bevilacqua incorporated their own business, Bevilacqua & Bjoin (B & B), which specialized in laying pipe. Bjoin owned 40 percent of the company. The company did most of its business between 1984 and 1990. The men began winding down the business around 1990, although Social Security records indicate it lasted until early 1992. When B & B ended, Bjoin and Bevilacqua threw all the company's paper records into a dumpster. Bjoin had no B & B documents in his possession at the time of trial.

Bjoin worked for a number of other companies until 2021, when he was diagnosed with lung cancer.

Bjoin subsequently brought this action against 10 defendants. By trial, only three defendants remained: JMM; Ferguson Enterprises, Inc. (Ferguson), which supplied CertainTeed AC pipe to Bjoin's worksites; and Industrial Holdings Corporation (formerly Carborundum) which made a cutting wheel that Bjoin believed he used to cut AC pipe.

At trial, Bjoin testified that he had cut JMM AC pipe with a power saw between 1978 and 1988, but most frequently from 1983 to 1985; the act of cutting produced a large quantity of dust; he did not wear a respirator while using a power saw; and he never saw a warning label on JMM's pipe. He did not learn that AC pipe was hazardous until the mid-1990s. Bjoin contended that warning labels should have stated that the pipe should not

4

be cut with a power saw, the dust from such cutting could cause cancer, and the risk of cancer could be mitigated by wearing a respirator.  Bjoin testified he would have worn a respirator if he had been properly warned.

JMM responded to Bjoin's evidence and argument in several ways.  As relevant to this appeal, JMM argued and offered evidence in support of two affirmative defenses: 1) Bjoin was a sophisticated user of AC pipe; and 2) the use of a power saw to cut AC pipe was, by 1983, so highly extraordinary as not to be a reasonably foreseeable misuse of the pipe.  For the reasons set forth in the discussion section below, we need not and do not consider this evidence in detail.

At the close of the evidence, the trial court granted JMM's motion for nonsuit on Bjoin's fraudulent concealment claim.  During jury deliberations, Bjoin settled with Industrial Holdings Corporation.

The jury made its findings as to JMM and Ferguson on a lengthy and detailed special verdict form.  The jury first found that Bjoin was exposed to asbestos from AC pipe supplied by JMM and Ferguson.  It also found that his exposure from JMM's AC pipe was a substantial factor in risk of developing lung cancer, but his exposure from Ferguson's AC pipe was not.[1]

The jury then turned to the affirmative defenses, finding Bjoin was a sophisticated user of JMM's AC pipe and then finding the use of a power saw to cut or bevel AC pipe was so highly extraordinary that it was not reasonably foreseeable to defendants, and therefore should be considered as the sole cause

---

[1]     Bjoin has not challenged the jury verdict in favor of Ferguson, and Ferguson is not a party to this appeal.

5

of Bjoin's injuries.  As a result of the product misuse finding, the jury was directed by the verdict form to skip to question 22, which concerned the negligence cause of action.  Thus, the jury did not answer any intervening questions related to Bjoin's strict product liability cause of action for failure to warn or his strict product liability cause of action for design defect.  The jury found JMM was not negligent.

Bjoin filed a motion for a new trial on his claims against JMM.  He argued JMM's evidence was insufficient to show he was a sophisticated user between 1983 and 1984; he contended he was just a pipe layer during that time.  Bjoin also contended the evidence was insufficient to justify the product misuse verdict because the evidence showed it was common in the 1980's to use a power saw to cut AC pipe.  The trial court denied the motion.  This appeal followed.

## DISCUSSION

"An appellate court ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' [Citations]  It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence.  [Citation.] This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Huong Que*).)  The appellant bears this burden on appeal, even if he did not bear the burden of proof in the trial court proceedings.  (See *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 [summary judgment motion].)

At a minimum, a party challenging the sufficiency of the evidence to support a particular finding " 'must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.*' " (*Huong Que, supra*, 150 Cal.App.4th

6

at p. 409.)[2]  The appellant " 'cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' " (*Ibid*.)

Under the substantial evidence standard, our review "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, [that] will support the [jury's] determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.) Evidence that supports the judgment must be accepted, conflicting evidence must be rejected, and all reasonable inferences must be drawn in favor of the verdict.  (*Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 366 (*Toste*); *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631.)  "We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party."  (*Pope, supra,* 229 Cal.App.4th at p. 1245.)  "Even if the jury's findings are against the weight of the evidence, they will be upheld if supported by evidence that is of ponderable legal significance and reasonable in nature."  (*Toste,* at p. 366.)

---

[2]     The Fourth District Court of Appeal has described an appellant's burden in even stronger terms.  (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Pope*) ["Appellants' 'fundamental obligation to this court, and a prerequisite to our consideration of their challenge' [Citation], is to 'set forth the version of events *most favorable to* [*respondent* ]' "].)

7

A.   *Sufficiency of the Evidence to Support the Jury's Finding in Favor of JMM on the Sophisticated User Affirmative Defense*

JMM asserted a sophisticated user affirmative defense to Bjoin's claims.  Under the sophisticated user defense, a manufacturer is not liable to a sophisticated user of its product for failure to warn about the product's dangers if the sophisticated user knew or should have known of the dangers. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 65 (*Johnson*).)

"The 'should have known' portion of the formulation is an objective standard.  [Citation.]  It examines what is generally known or should have been known to the class of sophisticated users at the time of the plaintiff's injury."  (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 601.)  The defense applies to both strict liability and negligent failure to warn claims. (*Johnson, supra*, 43 Cal.4th at p. 71.)

Here, the jury was instructed: "Defendants claim that they are not responsible for any harm to plaintiffs based on a failure to warn because Kirt Bjoin was a sophisticated user of asbestos cement pipe.  To succeed on this defense, defendants must prove that, at the time of the product use, Kirt Bjoin, because of his particular position, training, experience, knowledge, or skill, knew or should have known of the asbestos cement pipe's risk, harm or danger."  On the special verdict form, the jury answered yes to the question "Was Kirt Bjoin a sophisticated user of asbestos cement pipe throughout the entire time that he was exposed to asbestos cement pipe supplied by [JMM]?"

Bjoin contends that "the entire time" must be subdivided into two periods: 1) 1983–1984, during which he was a simple pipe-laying laborer, and 2) 1984–1990, when he was a co-owner of, employer and supervisor at B & B.  Bjoin's claim of error on appeal concerns only this first time period. He claims JMM failed to show that a simple pipe-laying laborer should have known of the dangers of cutting asbestos cement pipe with a power saw.

Bjoin has waived this claim by failing to set forth all the material evidence in the record on the issue of whether he was an ordinary laborer.  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*) [appellant is " 'required to set forth in their brief *all* the material evidence on the point, and *not merely their own evidence*.  Unless this is done the error is deemed to be waived' "].)

Bjoin's selection of the 1983 start date reflects the formation  of JMM.  It also loosely coincides with the abrupt departure of Bjoin's father, who ran Bjoin & Sons.  The 1984 end date reflects the formal incorporation of B & B.  Bjoin contends that the knowledge of these two categories of users is different. He treats it as essentially undisputed that he was a simple pipe-laying laborer.  He fails to address the evidence that he was more than a simple pipe laying laborer prior to the incorporation of B & B.

Bevilacqua testified that although Bjoin was a laborer at Bjoin & Sons in 1982, "he actually became a supervisor, I believe, towards the end."  According to Bevilacqua, the duty of a supervisor was primarily to direct crews.  And, "at the very end when his dad left, he was mostly in the office."

Samuel Wathen worked with Bjoin for about a year, ending in 1983. Wathen described Bjoin as performing a variety of tasks: "He kind of roamed around—he checked grade for the excavator. He helped lay pipe. He generally helped and he was generally just learning the business. He was fresh out of school[.]"

Dave Baumann characterized Bjoin as a "laborer," but described Bjoin's specific job duties as "[a]nywhere from following the backhoe to make sure the ditch was in order to laying the pipe." Bjoin has not pointed to evidence of a formal definition of laborer, but making sure a ditch is in order could reasonably be viewed as supervisory work. This would be consistent with Bevilacqua's definition of a supervisor as one who directs crews, and of a laborer as someone who used a shovel or jackhammer, carried pipe and laid pipe, basically working with their hands in the field.

Bjoin's own testimony indicates he was more than simply a pipe layer in 1983–1984, during the transition period between Bjoin & Sons and B & B. Bjoin's background was more than simply a pipe layer at Bjoin & Sons. When asked if he was a foreman with his father's company by 1981 and 1982, Bjoin replied: "I helped supervise—run some work as a foreman, but it would be like lining out trucks or doing stuff. I wasn't really running crews. I guess you could consider me a foreman." When asked why he took it upon himself to continue the business after his father left, Bjoin testified that his father left all his equipment and there were jobs he could finish, "[s]o it seemed like the best thing to do at that time was just try to pick it up and see if we can make it work, Bill [Bevilacqua] and I." "We still had all the contacts." Bjoin agreed he interfaced with the companies

10

that were paying him and his crew, along with Bill. As they got closer to formulating their own company, Bjoin would be the one responsible for renting equipment or ordering materials.[3]

Bjoin does not mention, let alone discuss, the implications of the evidence described above. At a minimum, this evidence on its face is favorable to JMM and inconsistent with Bjoin's claim that he was simply a pipe-laying laborer. The omission of this evidence, and any analysis of it, is sufficient to support a finding of waiver. Moreover, this evidence, viewed in the light most favorable to JMM, is sufficient to support a reasonable inference that Bjoin (and Bevilacqua) were the owners and/or supervisors of the entity that performed pipe installation in the period between the disappearance of Bjoin's father and the formal incorporation of B & B. A business can take many legal forms in California, and we do not view the formal incorporation of B & B as determinative.

By failing to show there was no evidence that he was more than a simple pipe-layer in 1983–1984, Bjoin has waived his claim that the evidence is insufficient to support the jury's verdict that he was a sophisticated user in 1983–1984. Therefore, we need not and do not consider his claim that simple pipe-laying

---

[3]     Bjoin did testify that all the people from Bjoin & Sons who continued working during this time worked on their own, there was no structure and everyone "pretty much" just went around doing what they wanted. This testimony comes close to being incredible on its face, given that, pipes were laid pursuant to a precise plan developed by engineers and the pipe laying itself was not a single person job – it required coordination among a team of workers performing different tasks.

laborers were not aware that they could mitigate the risk of using a power saw by wearing a respirator.

B.    *Sufficiency of the Evidence to Support the Jury Finding in Favor of JMM on the Affirmative Defense of Product Misuse*

The trial court instructed the jury using a fact specific version of CACI No. 1245, as follows: "Defendants claim that they are not responsible for plaintiffs' claimed harm because the asbestos cement pipe was misused after it left defendants' possession. To succeed on this defense, defendants must prove that: [¶] 1. The asbestos cement pipe was misused after it left defendants' possession; and [¶] 2. The misuse was so highly extraordinary that it was not reasonably foreseeable to defendants and therefore should be considered as the sole cause of plaintiffs' harm." The use note for CACI No. 1245 states that this defense applies to strict liability claims. (Judicial Council of California Civil Jury Instruction No. 1245.) As a practical matter, in this case the instruction was relevant only to Bjoin's cause of action for design defect strict liability.[4]

Bjoin contends the evidence was insufficient to support an instruction on product misuse and insufficient to support the jury's verdict on this defense. We hold that Bjoin has waived both claims.

---

[4]    Bjoin also alleged a cause of action for strict liability failure to warn, but as set forth above, the sophisticated user defense applied to and defeated that cause of action.

The trial court instructed the jury on strict liability design defect using fact specific versions of CACI 1203 (consumer expectations test) and 1204 (risk-benefit test).

12

1. <u>Instruction</u>

Bjoin has waived any separate claim of instructional error. There is no dispute that giving an instruction which is not supported by the evidence is error, but Bjoin has failed to provide a standard of review for such error and has failed to demonstrate prejudice from any error. In a footnote in his reply brief, citing *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 303 (*Joyce*), Bjorn states: "Contrary to JMM's insistence otherwise, if the product misuse instruction was 'not supported by the evidence [and was] likely to mislead the jury,' then it necessarily 'divert[ed]' jurors 'from the real issues before them' and prejudiced the proceedings." This is a misleading quote from *Joyce* and does not correctly state the law on this topic.[5]

As a general rule, giving the jury a legally correct instruction unsupported by the evidence is harmless when the jury is also instructed to disregard any instructions it finds are not supported by the evidence. (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 371.) The jury received such an instruction

_____

[5]    The Court of Appeal in *Joyce* stated: "An instruction correct in the abstract, may not be given where it is not supported by the evidence *or* is likely to mislead the jury." (*Joyce, supra,* 110 Cal.App.4th at p. 303, italics added.) The *Joyce* court described the special instructions requested by the defendant as "argumentative and confusing." (*Ibid.*) Bjoin has not made any argument that CACI No. 1245 is argumentative or confusing. More importantly, the trial court in *Joyce* rejected the requested instructions. (*Ibid.*) We see no discussion in *Joyce* of prejudice from giving an unsupported instruction, no doubt because the instructions at issue were never given.

13

here.[6]  While there may be exceptions to this general rule, Bjoin has not offered any legal or factual argument that this case should be an exception.

    2.    <u>Verdict</u>

Bjoin's attack on the jury finding on the defense of product misuse is twofold.  First, he contends that "the overwhelming evidence at trial was that using power saws to cut AC pipe during the 1980s was a known risk."  Next, he acknowledges that foreseeable product misuse can be a viable defense when the manufacturer has warned against such misuse, but he contends JMM's warnings were legally inadequate.

We would not characterize the evidence described by Bjoin as "overwhelming."  But the weight of the evidence is not the determinative factor in our review for sufficiency of the evidence to support a verdict. "Even if the jury's findings are against the weight of the evidence, they will be upheld if supported by evidence that is of ponderable legal significance and reasonable in nature." (*Toste, supra*, 245 Cal.App.4th at p. 366.)

Bjoin has failed to set forth the evidence favorable to JMM and the jury's finding, as required, and so has waived this claim. (*Foreman, supra,* 3 Cal.3d at p. 881.)  To give just one example, Bjoin claims in his opening brief "[e]very witness who worked in the pipe-laying industry during the 1980s—including Mr. Bjoin; his coworkers, Mr. Baumann, Mr. Bevilacqua, and Mr. Wathen;

---

[6]    The jury was instructed: "After you have decided what the facts are, you may find that some instructions do not apply.  In that case, follow the instructions that do apply and use them together with the facts to reach your verdict."

14

and JMM's construction expert, Mr. Stone—testified that power saws were still used to cut AC pipe during that time. (Section II., A., 4., *supra*.)" There is only one section of Bjoin's brief labelled with the number 4, and we see no reference to Michael Stone in that section. If anything, Stone's testimony was that he stopped using a power saw in 1979 and the use of power saws to cut AC pipe essentially stopped after 1980 or 1981. Stone was testifying as an expert and so could speak to the industry as a whole. The witnesses identified by Bjoin were his co-workers during the 1980's. They did not qualify as experts and so could testify only to their personal observations, which were limited.

The remainder of Bjoin's evidence is inferences from the prior approval of power saw usage, the continued existence of Cal-OSHA regulations barring the use of power saw to cut AC pipe and JMM's warnings against power saw usage. Bjoin, however, fails to draw these inferences in favor of the jury's finding, as is required. (*Toste, supra*, 245 Cal.App.4th at p. 366.)

Even assuming for the sake of argument that the evidence was undisputed that some use of power saws continued into the 1980's and so was a foreseeable risk, Bjoin acknowledges product misuse can be a viable defense even to a reasonably foreseeable risk if the manufacturer provides an adequate warning of the risk. We agree with Bjoin that the sophisticated user finding is not a finding that JMM's warnings were adequate. It is a finding that warnings were unnecessary.[7] Bjoin does not, however, discuss the effect of the sophisticated user finding on the product misuse defense. Specifically, Bjoin does not discuss whether a

---

[7]    The product misuse instruction did not require any finding by the jury about the adequacy of warnings against misuse.

15

sophisticated user's knowledge of the dangers of misuse could act as a substitute for a defendant's warning when the defendant asserts a product misuse defense.

In *Johnson*, the Court implicitly recognized that a sophisticated user defense could have relevance to product misuse issues. The Court pointed out that "numerous generally safe products exist that can become hazardous when the proper precautions are not followed. Although manufacturers are responsible for products that contain dangers of which the public is unaware, they are not insurers, even under strict liability, for the mistakes or carelessness of consumers who should know of the dangers involved. [Citation.] Accordingly, we adopt the [sophisticated user] defense in California." (*Johnson, supra,* 43 Cal.4th at p. 70.) This suggests that a sophisticated user's knowledge of the dangers of misuse could be a substitute for an adequate warning of the dangers of misuse.[8] If so, JMM would not be liable for any foreseeable misuse by Bjoin. This failure to cite and analyze relevant law is an additional ground for waiver.[9]

---

[8] The *Johnson* Court did expressly decline to decide whether a plaintiff could negate the sophisticated user defense "by showing that the sophisticated user's misuse of the product was foreseeable." (*Johnson, supra,* 43 Cal.4th at p. 69, fn. 5.)

[9] Bjoin has also failed to explain how he would be prejudiced by an unsupported product misuse finding with respect to his consumer expectations theory of strict liability design defect, given the sophisticated user finding. Division 5 of this District Court of Appeal has indicated in dicta that a sophisticated user defense applies in design defect cases, specifically under the consumer expectation theory of a design defect. (*Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549, 558, fn. 4,

(See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand*) [We may and do " 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' "])

C.   *Sufficiency of the Evidence to Support the Jury's Verdict that JMM Was Not Negligent*

The jury found in favor of JMM on Bjoin's cause of action for general negligence.  Bjoin claims that because there was no substantial evidence to support the jury's sophisticated user and product misuse verdicts, the jury's verdict that JMM was not negligent must be reversed as well.  We have found that Bjoin has failed to show insufficient evidence to support those findings.  As a result, his claim of insufficient evidence to support the negligence verdict fails as well.

D.   *Motion in Limine to Exclude Cal-OSHA Regulations*

Bjoin contends the trial court's denial of his motion in limine to exclude reference to Cal-OSHA regulations violated

---

559 [plaintiff alleged only a risk-benefit design defect theory, not consumer expectations].)  The First District Court of Appeal has agreed with *Johnson*.  (*Watts v. Pneumo Abex, LLC* (2024) 106 Cal.App.5th 248, 260.)  Both courts agree that a sophisticated user is not an ordinary consumer, and so a sophisticated user may not prevail on a design defect cause of action under the consumer expectation theory.  Bjoin does not acknowledge these cases or attempt to distinguish them.

17

Labor Code[10] section 6304.5 and the holding of *Elsner v. Uveges* (2004) 34 Cal.4th 915 (*Elsner*).  We find Bjoin has waived this claim.

From 1972 to 1999, section 6304.5 limited the introduction of Cal-OSHA regulations to employer-employee lawsuits; the regulations could not be introduced at all in a lawsuit by an employee against a third party tortfeasor.  (*Elsner, supra,* 34 Cal.4th at p. 926.)  In 1999, the legislature amended section 6304.5 to provide that, "[i]n general, plaintiffs may use Cal–OSHA provisions to show a duty or standard of care to the same extent as any other regulation or statute, whether the defendant is their employer or a third party.  The lone exception arises when the state is the defendant." (*Id.* at pp. 926, 935–936.)

When the defendant's wrongful conduct occurs after the 1999 amendment, application of section 6304.5 is straightforward.  When, as here, the conduct occurred before 1999, section 6304.5 may not be used to retroactively " 'change[] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct[]' " or to " 'substantially affect[] existing rights and obligations[.]' " (*Elsner, supra*, 34 Cal.4th at p. 937.)  *Elsner* involved such pre-1999 conduct, and the Court in *Elsner* considered the three specific reasons section 6304.5 was used in that case: "to allow Cal-OSHA provisions to be introduced to establish a duty of care, to allow Cal-OSHA provisions to be introduced to establish the standard of care, and to allow the burden of proof to shift to [defendant] once a violation of Cal-OSHA was found." (*Elsner,* at p. 937.)  Under the facts of the *Elsner* case, the regulations used

---

10      Undesignated statutory references are to the Labor Code.

did not expand the duty of care and so their use was not impermissibly retroactive. But the latter two uses did change the standard of care and shift the burden of proof and so were improper retroactive uses of the regulations.

Bjoin focuses on the three specific uses in *Elsner* and contends that an improper retroactive application of section 6304.5 occurs whenever a Cal-OSHA regulation (a) expands a party's duty of care, (b) sets a new standard of care for the party that didn't exist at the time of the alleged conduct, or (c) changes the evidentiary burdens with respect to that party's past conduct. (*Elsner, supra*, 34 Cal.4th at pp. 937–938.) This is true as far as it goes. Bjoin then contends that "[i]nstead of barring evidence of any Cal-OSHA provision that expanded a party's duty of care, or which set a standard of care that did not exist under the common law, the order allowed unfettered evidence of specific pre-1999 Cal-OSHA provisions provided the jury did not consider them in determining whether any person or entity was at fault for the Plaintiffs' harm."

Although "[a] trial court's determination of the admissibility of evidence . . . is generally reviewed for an abuse of discretion," "[t]o the extent the trial court's ruling depends on the proper interpretation of [a statute], it presents a question of law; and [its] review is de novo." (*People v. Walker* (2006) 139 Cal.App.4th 782, 794–795, fn. omitted.)

We do not agree with Bjoin's characterization of the trial court's ruling. As Bjoin acknowledges in an earlier section of his opening brief, the trial court stated: "[T]his Court would like to make clear that . . . Defendants may not refer to OSHA or Cal/OSHA guidelines to expand the common law duty of care plaintiff owed to his employees and to himself[.]" The trial court

19

also stated: "The use of Cal/OSHA provisions to establish the standard of care and shift the burden of proof to plaintiff would be improper and violate the holding of *Elsner vs. Uveges*." Bjoin's characterization of the court's ruling is based on the trial court's comments during the discussion of potential special jury instructions on the use of Cal-OSHA regulations and cannot be reasonably understood as negating these quoted statements, particularly since the trial court ultimately did not give any such special instruction.

Even assuming for the sake of argument that the trial court's ruling did erroneously permit such use, Bjoin would still bear the burden of showing that such impermissible use in fact occurred; not all references to Cal-OSHA regulations are improper. As the analysis in *Elsner* shows, Bjoin would have to cite law or evidence showing what the pre-existing (common law) duty of care and standard of care were, and how Cal-OSHA regulations differed. Bjoin would similarly have to explain how the use of Cal-OSHA regulations shifted a previously-existing burden of proof. (See *Elsner, supra*, 34 Cal.4th at pp. 937–938.) We see no such citations or explanations. Simply citing instances where specific regulations were admitted into evidence is not enough, particularly, when the regulations are admissible for the relevant purposes of showing knowledge and foreseeability (which is relevant to the scope of the duty of care). (See *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1146–1147.) These omissions alone are sufficient to support our waiver finding. (*United Grand, supra*, 36 Cal.App.5th at p. 153 [We may and do " 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to

20

adopt' " as well as arguments that are not supported by specific citations to the record.].)

Bjoin has also waived his claim by failing to cite and apply the standard of review for prejudice from the erroneous admission of evidence. Prejudice is not presumed from the erroneous admission of evidence. (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799.) It is the appellant's burden to establish that the error was prejudicial. (*Ibid*.) The standard of review is not obscure and can be found in *Elsner*: "We will not reverse a judgment unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) In the case of civil state law error, this standard is met when 'there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' " (*Elsner, supra*, 34 Cal.4th at p. 939.)

When Bjoin does finally address the issue of prejudice in his reply brief, he first treats the facts of his case as identical to the facts of *Elsner*, and, at best, implicitly relies on the trial court's analysis and finding of prejudice in that case. Bjoin also complains of the use of the Cal-OSHA regulations to show knowledge for sophisticated users and lack of foreseeability for product misuse. Although we do not consider arguments made for the first time in a reply brief (*United Grand, supra*, 36 Cal.App.5th at p. 158), we note the facts of this case are not the same as those in *Elsner*,[11] JMM relied on additional evidence

---

[11]    To give just one example, in *Elsner*, "the trial court granted Elsner's motion in limine, excluding any testimony of industry

21

to support both affirmative defenses, and Bjoin does not address *Kesner,* which at least arguably permits the use of regulations to show knowledge and foreseeability.

E.      *Nonsuit on the Cause of Action for Fraudulent Concealment*

We review de novo an order granting nonsuit. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214–1215.) A trial court "may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118.) In determining whether a plaintiff's evidence is sufficient, we do not weigh the evidence or consider the credibility of witnesses. We accept as true the evidence most favorable to the plaintiff, disregard conflicting evidence and draw all legitimate inferences from the evidence in the plaintiff's favor. (*Ibid*.) "[W]here a nonsuit has been granted for the wrong reason but the order itself is correct based on other grounds," we will affirm. (*Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1156.)

"The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) the plaintiff sustained damage as a result of

---

custom and practice at odds with the requirements of Cal-OSHA provisions." (*Elsner, supra*, 34 Cal.4th at p. 939.) Here, the trial court expressly instructed the jury that it could "consider customs or practices in the community in deciding whether plaintiff or defendant acted reasonably."

22

the concealment or suppression of the material fact." (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 40 (*Rattagan*).)

Here, the trial court found that there was sufficient evidence of a duty to disclose on JMM's part, but insufficient evidence of the other elements of concealment. Bjoin contends the trial court erred in finding insufficient evidence of the other elements. JMM contends there is insufficient evidence of the direct relationship needed to create a duty to disclose, and the nonsuit must be upheld on that alternate ground. We agree with JMM.

The California Supreme Court has recently summarized the law of fraudulent concealment as follows: A duty to disclose requires "a preexisting relationship between the parties, such as 'between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.' ([*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 337].) 'Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large.' (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 312 [213 Cal.Rptr.3d 82].)" (*Rattagan, supra*, 17 Cal.5th at pp. 40–41.)

Bjoin argues for a broader basis for a duty to disclose and relies on *Bigler-Engler v. Breg, Inc.* and *Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094 (*Bader*) to support his argument. Specifically, Bjoin relies on one sentence from *Bigler*: "The evidence also does not show that [manufacturer] Breg directly advertised its products to consumers such as Engler or

23

that it derived any monetary benefit directly from Engler's individual rental of the Polar Care device." (*Bigler-Engler v. Breg, Inc, supra*, 7 Cal.App.5th at p. 314 (*Bigler*).) Bjoin also relies on *Bader*'s adoption of *Bigler*,[12] and its statement that a duty to disclose could be found in the case before it because there was evidence "showing that [manufacturer] J&J was involved in retail sales of JBP [talcum powder] to consumers and profited therefrom." (*Bader,* at p. 1132.) From these two statements, Bjoin posits a broad rule that a duty to disclose relationship is created between a manufacturer and a consumer when a manufacturer advertises its products to consumers or profits from the sale of its products to consumers. We do not agree that *Bigler* created such a broad duty to disclose.

Before discussing the state of evidence in the case before it, the *Bigler* court had accurately summarized exiting law as follows: " 'A duty to disclose facts arises only when the parties are in a relationship that gives rise to the duty, such as " 'seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual arrangement.' " ' [Citation.] [¶] Our Supreme Court has described the necessary relationship giving rise to a duty to disclose as a 'transaction' between the plaintiff and defendant . . . . Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise

---

[12]    The *Bader* court stated: "A proper instruction under *Bigler-Engler* thus would have instructed the jury here to consider whether similar evidence of transactions, advertising, or J&J's direct monetary benefit supported the transactional requirement." (*Bader, supra,* 86 Cal.App.5th at p. 1132.)

24

between the defendant and the public at large." (*Bigler, supra,* 7 Cal.App.5th at pp. 311–312.) The court then specifically found: "An essential element underlying Engler's claim for intentional concealment, a duty to disclose, is absent here because there was no evidence of a relationship between Engler (or her parents) and Breg sufficient to give rise to a duty to disclose. Breg did not transact with Engler or her parents in any way." (*Id.* at p. 314.)

The sentence upon which Bjoin relies is found in the *Bigler* court's subsequent laundry list of *absent* evidence in the case. "Engler obtained her Polar Care device from Oasis, based on a prescription written by [Dr. David] Chao, all without Breg's involvement. The evidence does not show Breg knew—prior to this lawsuit—that Engler was a potential user of the Polar Care device, that she was prescribed the Polar Care device, or that she used the Polar Care device. The evidence also does not show that Breg directly advertised its products to consumers such as Engler or that it derived any monetary benefit directly from Engler's individual rental of the Polar Care device. Indeed, Oasis appears to have obtained the Polar Care device Engler used from Breg several years before Engler's surgery and maintained the device itself for rental to its patients." (*Bigler, supra,* 7 Cal.App.5th at p. 314.)

We do not believe the *Bigler* court intended to greatly expand the well settled law on fraudulent concealment, which it had just summarized, solely by its description of evidence that had not been offered in the case, without any supporting legal analysis or citation to legal authority, indeed without any acknowledgement that it was expanding the law. Further, in many factual circumstances, such an expansion would create the exact duty-to-disclose relationship which the *Bigler* court has

25

expressly disavowed: a relationship between the defendant and the public at large.

It would also be inconsistent with the California Supreme Court's most recent summary of the law: A duty to disclose requires "a preexisting relationship between the parties, such as 'between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. [Citation.] All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances.' [Citation.] 'Such a transaction must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the defendant and the public at large.' (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 312 [213 Cal.Rptr.3d 82].)" (*Rattagan, supra,* 17 Cal.5th at pp. 40–41.)

We recognize that the *Bader* court did treat *Bigler* as expanding the basis for a duty to disclose, but it did so without any analysis and we do not find the adoption persuasive. It is also not clear what the *Bader* court meant by its holding that a duty to disclose could be found in the case before it because there was evidence "showing that [manufacturer] J&J was involved in retail sales of JBP [talcum powder] to consumers and profited therefrom." (*Bader, supra*, 86 Cal.App.5th at p. 1132.) There is absolutely nothing in the opinion indicating what that involvement was or how exactly J&J profited. This statement is too broad and vague to constitute a standard which is applicable in other cases.

Even assuming for the sake of argument that *Bigler* does represent an expansion of the law of fraudulent concealment, Bjoin has not in fact identified evidence that JMM "*directly* advertised to consumers such as" Bjoin or "derived any monetary benefit *directly*" from Bjoin's company's "individual" purchase of JMM's ACC pipe from supply houses, as would be required by the language in *Bigler*.

Bjoin points to an internal JMM memo discussing one advertisement purportedly placed in seven "trade magazines" to support the advertising element. The gist of the ad is that JMM and J-M A/C Pipe Corporation have purchased the pipe-producing plants and assets of Johns-Manville Sales Corporation and are now a new company. Bjoin does not point to any evidence in the record showing who read those magazines. He simply contends that the publications are "trade magazines" and it is undisputed that he was "an AC pipe tradesman." Leaving aside that we do not know what Bjoin means by "AC pipe tradesmen," we cannot simply speculate that "AC pipe tradesmen" read every "trade magazine" published. Three of the magazines have the words engineer or engineering in their titles—Bjoin does not explain why it would be reasonable to infer that an AC pipe tradesman would read an engineering journal. Other magazines appear to be trade association newsletters, and Bjoin offers no indication of whether AC pipe tradesmen are members of those associations. We cannot simply speculate about the magazines' readership. To prove that JMM "directly advertised" to "AC pipe tradesmen" like Bjoin, Bjoin would need to show that such individuals were known or expected readers of the specific trade magazines at issue. He has not come close to doing so.

27

Bjoin testified that he purchased JMM AC pipe from supply houses and did not believe it was even possible for him to purchase AC pipe directly from a manufacturer. Bjoin does not offer any facts that would show that JMM "derived a direct monetary benefit" from Bjoin's purchase of JMM AC pipe from a supply house. Under this system, JMM directly profited from its sales to supply houses. JMM would appear to have only derived an indirect economic benefit from consumer purchases from supply houses: The more JMM AC pipe a supply house sold, the more JMM AC pipe the supply house might buy from JMM. As evidence of direct profit, Bjoin points to a JMM memorandum concerning sales of its AC pipe out of Denison. It is not clear where Denison is located, but there are no references to sales to any entity in California, let alone to individual pipe laying contractors. We do not see the relevance of this memo.

### DISPOSITION

We affirm the judgment. Appellant to pay costs on appeal.


STRATTON, P. J.

We concur:


WILEY, J.                    VIRAMONTES, J.

28

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALLISON BJOIN, Individually and as Personal Representative, etc.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>J-M MANUFACTURING COMPANY, INC.,<br><br>Defendant and Respondent. | B335334<br><br>(Los Angeles County Super. Ct. No. 21STCV30709)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on July 25, 2025, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.


_____
STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.