Filed 4/15/26  Brennan Lynn v. Murphy CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BRENNAN LYNN, INC., | |
| Plaintiff and Respondent, | G064470 |
| v. | (Super. Ct. No. CIVSB2104344) |
| JAMES MURPHY, | O P I N I O N |
| Defendant and Appellant. | |
| JAMES MURPHY, | |
| Plaintiff and Appellant, | (Super. Ct. No. LLTVA2100810) |
| v. | |
| BRENNAN LYNN, INC., | |
| Defendant and Respondent; | |
| JOANNA DAVIS et al., | |
| Defendants. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Michael A. Sachs, Judge. Affirmed.

Solution Law and Christopher A. Darden for Defendant and Appellant.

Fennemore, Daniel C. Stein, and Graham A. Van Leuven for Plaintiff and Respondent.

\* \* \*

Defendant James Murphy appeals a judgment entered in favor of plaintiff Brennan Lynn, Inc. (BLI) on claims stemming from Murphy's failure to sell a piece of commercial property to BLI, his tenant, pursuant to an option in BLI's multi-year lease. After a bench trial, the court found: (1) BLI had timely and properly exercised the option, requiring Murphy to sell the property; and (2) Murphy breached the lease by failing to do so. The court also found BLI had not abandoned its intent to exercise the option even though it continued to pay rent and took measures to move the business to another location.

Murphy contends these findings are not supported by substantial evidence. We find he has waived this claim based on his defective brief. But even if he had not, we would disagree with him. We therefore affirm the judgment.

## FACTS[1]

Murphy purchased Taylor's Bar and Grill (Taylor's) in Bryn Mawr, California in 1990, and by 2005, had consummated the purchase of the

---

[1] As this appeal rests on the sufficiency of the evidence, "in summarizing the facts . . . we 'must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable

real property on which the establishment sits. Murphy operated Taylor's until 2015, at which time he sold the assets of the business to BLI by way of an asset sale and purchase agreement (asset agreement). Murphy retained ownership of the real property, which was to be leased for BLI's use in operating Taylor's. Murphy and BLI were to enter a lease at closing of the asset sale, with a base rent of $5,000 per month. The lease was drafted by Murphy's attorney, Wilfrid Lemann, and signed by both parties at Lemann's office.

The lease provided for a five-year term, beginning on July 29, 2015. Paragraph 44 of the lease also granted BLI and its married principals, Michael and Joanna Davis,[2] an option to purchase the property during the lease term. The option stated in pertinent part as follows: "As a condition to exercise this Purchase Option, Tenant cannot be in default (and has not been in default for at least six (6) months prior to exercising this Purchase Option) under the terms of this Lease. The Purchase Option may be exercised by delivering written notice to Landlord. If Tenant exercises this Purchase Option, the purchase price for the Premises shall be determined by appraisal based on the Premise's fair market value. Each Party shall hire their own appraiser and if the two values determined by those two appraisals are within 15% of each other, then the fair market value of the Premises shall be set as the average of the two new appraisals. If the fair market value determined by the two new appraisals differ by more than 15% and the

---

inference, and resolving conflicts in support of the judgment.'" (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642, fn. 3, italics omitted.)

[2] We refer to the couple as the Davises, and to the two individually by their first names. We do this only for purposes of clarity and intend no disrespect.

Parties cannot otherwise agree on the fair market value, the Premises fair market value shall be determined by binding arbitration . . . ."

This purchase option was an important component of the lease for the Davises because they wanted to own the property after liquidating many of their investments to fund BLI's purchase of Taylor's.

In 2019, Murphy was present when BLI installed a septic tank and seepage pit on the property at its own expense. At that time, Michael told Murphy he wished to purchase the property. Murphy told him to wait until the end of the lease term.[3] It is undisputed that, during the period of the lease, the parties both performed by its terms.

With the lease scheduled to expire at the end of July 2020, Michael sought the advice of attorney Ashley Wedding to help BLI navigate exercising the purchase option. On Wedding's advice, Michael drafted a document to Murphy titled "Notice of Exercising the Right to Purchase Property," which stated as follows: "Please be advised that the undersigned, as Lessees', under lease permission known as 'Option to Purchase' Property . . . . We look forward to having a smooth transaction and anticipate following direction as per Lease Agreement dated July 29, 2015." Michael and Joanna signed the document, and on July 1, 2020, Michael instructed the couple's daughter, Linda, who was the general manager of Taylor's, to deliver the document to Murphy with the monthly rent check.

---

[3] From our review of the record, Murphy was not asked at trial whether he had made such a statement. However, Murphy did recall being on the property for the septic tank work, and he remembered Michael raising the subject of purchasing the property at the time. Specifically, he recalled Michael looking at him and saying something to the effect of "900, how does that sound?" to which Murphy shook his head no.

Linda testified that she took the notice document to Taylor's. She then printed and signed the monthly rent check as per her usual practice and put both the check and the notice document in an envelope. She was in her office when Murphy came to Taylor's to retrieve the rent check, as he normally did. She gave Murphy the envelope, which he immediately opened; she could see he was reviewing the document. After doing so, Linda testified, Murphy looked at her and told her to tell her father it would not be "as easy or smooth as he thought it would be." The bartender then on duty, Jennifer Simon, confirmed that Murphy was at the bar on July 1, 2020.

Linda called her parents and told them what had occurred. Joanna corroborated Linda's testimony, saying she and Michael had been on speaker phone with Linda when Linda told them what Murphy had said. Murphy denied making the statement and denied ever receiving the notice document.[4]

On July 2, 2020, Michael sent a text message to Murphy asking to talk about "clarifying our intentions." Michael then spoke with Murphy on the phone. The two discussed the Davises' potential purchase of the property. According to Michael, Murphy acknowledged the process required by the purchase option in the lease, but he urged the Davises to extend the lease

---

[4] In conjunction with his denial, Murphy says BLI's evidence on this point is inconsistent. To-wit, Michael acknowledged filing a declaration earlier in the litigation which contained an averment that he had delivered the notice document to Murphy's home. However, Linda resolved the discrepancy when she testified, stating she had noticed the declaration's statement was incorrect after it had been filed, and notified Michael, who then notified the attorney who had filed it. The attorney apparently took no steps to correct the declaration.

because he was not sure they would be able to buy the property.[5] Michael testified he told Murphy that he and his wife "only planned on purchasing this property," and that was their main goal. Michael told Murphy the Davises wanted to get an appraisal done.

After this conversation, Michael heard from Lemann on July 8, 2020. Lemann asked whether Michael had a signed copy of the lease[6] and urged him to extend it. When Michael told Lemann that he wished to purchase the property under the option, he said Lemann told him something to the effect of "those things aren't valid." Lemann also said Murphy would probably sell to Michael "for over market value." Michael told Lemann to speak with Wedding.[7] He sent Wedding a copy of the notice document Linda had delivered to Murphy.

Lemann and Wedding began corresponding. Wedding testified she told Lemann the Davises wanted to purchase the property, and she thought Lemann understood this. She understood from Lemann that the purchase price was going to be an issue, because Murphy thought the property was worth around $1.5 million. Wedding did not provide Lemann

---

[5] Murphy testified he could not recall this conversation.

[6] According to the record, none of the parties was able to locate a fully executed copy of the lease.

[7] Lemann testified he called Michael after speaking with Murphy; the purpose was to determine what the next steps would be, given the lease's pending expiration. Murphy testified he did not know why Lemann contacted Michael on July 8. He acknowledged talking to Lemann about the lease's expiration, and that he had "not heard" from Michael about purchasing the property.

6

with a copy of the notice document because she thought Lemann knew the option had been exercised, and that was why he called Michael on July 8.

Meanwhile, Michael began searching for financing for the purchase. He obtained a letter of interest from his credit union and authorized them to withdraw money from his own funds to pay for a property appraisal. Michael received the appraisal report on July 28 valuing the property at $940,000 and forwarded it to Wedding. BLI also tendered payment of $5,000 for August rent. The Davises then waited for Murphy to conduct his own appraisal.

On August 10, Lemann sent Wedding a letter, stating Murphy was treating the check as rent for "a holdover month-to-month tenancy" and appeared to question whether there was a lease, since the original "cannot be found." Lemann said "[i]f there is a lease, we need to determine if there was an effective exercise of the option . . . . If there is no lease, then there is no option, and your tenant will remain on a month-to-month tenancy." Regarding selling the property to BLI, Lemann suggested the appraisal procedure in the option was "nonapplicable" and that BLI would need to "make an offer that is much closer to" what Murphy wanted.

Wedding testified Lemann's August 10 letter demonstrated that he was "talking out of both sides of his mouth"; on the one hand, questioning the existence of the lease while on the other, recognizing there was a procedure under it for determining the purchase price. She said Lemann dismissed the idea of Murphy getting an appraisal because Murphy "had an opinion of the value of the property and he wasn't going to accept anything less than that." Wedding responded to Lemann by "reserving . . . respective claims and defenses related to the Lease agreement," and notifying him that BLI wished to continue the tenancy on a month-to-month basis, or for an

additional year with an "exclusive option to purchase the Premises." She and Michael both reasoned that they could maintain the status quo with the tenancy while pursuing the property purchase by way of the option procedure.

Lemann testified Wedding never told him that the Davises had exercised the option and she did not give him a copy of the notice document. And Murphy never told Lemann that he had seen the notice document. According to Lemann, Wedding told him that the Davises did not have sufficient financing to close the transaction and they needed more time. Wedding denied saying this, and testified the reality was to the contrary. She said she told Lemann to get an appraisal of the property, and he continually resisted.

Indeed, Murphy testified he did not want to get an appraisal. He testified repeatedly that he did not need one because he was under no obligation to sell to BLI. To Murphy, putting the property on the market was the best way to test his belief that its value was nearer to $1.5 million. So around October 2020, Murphy put a "For Sale by Owner" sign on the property. In seeing this sign, Michael authorized Wedding to present a letter of intent to purchase the property for the appraisal price of $940,000, which she did.

Lemann responded that the "purchase price is too low," and informed Wedding that Murphy intended to "entertain[] offers based upon the interest generated by the sign." He advised Wedding that Murphy would be raising BLI's rent from $5,000 to $7,500 per month. Murphy testified he felt bad about raising the rent but did so "in order to get something going

8

here."[8] He thought the property could fetch around $10,000 per month in rent, and he did not want to lease it for another year in case another buyer came along.

Wedding thought it was a "ridiculous request" for Murphy to raise the rent. The Davises felt bullied by the move, but they paid the increased rent because they hoped doing so would help them move the eventual purchase forward.

At this point, neither Wedding nor BLI felt Murphy and Lemann were acting in good faith. Wedding got the impression that Murphy and Lemann were intentionally avoiding selling the property to BLI. She felt negotiating options were exhausted and advised BLI to file a lawsuit.

She sent Lemann a copy of the appraisal report and told him that BLI found Murphy's demands "simply untenable," such that BLI was seeking "an alternate location for Taylor's to operate." She also suggested that Murphy could repurchase Taylor's if he desired to make a reasonable offer for the business. Michael testified that at this point in time, BLI was searching for other properties because things were not moving along with Murphy.

On November 5, Wedding wrote to Lemann that BLI intended to close Taylor's and that BLI could no longer work with Murphy due to his demands "and refusal to honor his promises under the Lease Agreement and Option to Purchase." She further advised that BLI would be vacating the premises by December 1 with no further rent payments forthcoming. Lemann responded that Murphy expected the property to be vacated by November 30.

_____

[8] It is unclear what Murphy meant by "get something going here," as he was not asked to clarify the statement. However, he later testified that he just needed Michael "to up the price."

In the end, however, BLI was unable to secure a new property and so it continued to operate Taylor's at its original location.

At the end of February 2021, Murphy, through his counsel, served BLI with a 30-day notice to vacate.

PROCEDURAL HISTORY

After being served with the notice to vacate, BLI filed a complaint against Murphy alleging breach of contract, promissory estoppel, fraud, and unfair business practices.[9] Murphy then filed an unlawful detainer action against BLI and the Davises, alleging they had failed to pay rent in accordance with their month-to-month tenancy. The two cases were consolidated, and the matter was tried before the court.

In its final statement of decision, the trial court found in favor of BLI and against Murphy, making two central findings. First, it found BLI had validly and timely exercised its purchase option under the lease. Second, it found BLI had not abandoned or waived the purchase option by its conduct after the lease expired, as Murphy argued at trial.

Murphy timely appealed.

DISCUSSION

On appeal, Murphy argues the trial court's findings were not supported by substantial evidence. We find Murphy has waived this argument, but even if we considered it on its merits, we would disagree.

---

[9] The latter two causes of action were later dismissed without prejudice.

# I.

## STANDARD OF REVIEW

"We review findings of fact for substantial evidence. "'In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." [Citation.]

"'"The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial." [Citation.] "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." [Citation.] "'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'"' [Citation.]" (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026–1027.)

# II.

## PROCEDURAL ISSUES WITH MURPHY'S OPENING BRIEF

In its respondent's brief, BLI points out that Murphy's opening brief—and specifically, its statement of facts—does not comport with the

11

requirements for matters requiring substantial evidence review. As such, BLI argues Murphy has waived any argument based on insufficiency of the evidence to support the court's decision. "An appellate court will consider the sufficiency of the evidence to support a given finding only after a party tenders such an issue together with a fair summary of the evidence bearing on the challenged finding, particularly including evidence that arguably *supports* it." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409–410.)

Murphy's statement of facts is starkly deficient in its summary of the evidence. For example, Murphy mentions that the Davises claim to have delivered to him written notice of exercising the option. And he states that he denies receiving the notice. But he fails to mention other evidence which shows that he was aware either before or around the time of the lease term's expiration that BLI or the Davises intended to exercise the option. This would include the conversation he acknowledges he had with Michael during the septic tank work; Michael's testimony about Murphy telling him to wait until the end of the lease term to exercise the option; and Michael's testimony about what he said on the pair's July 2 phone call. Murphy also leaves out the statement he is alleged to have made to Linda when he picked up the July rent check—that she should tell her father the transaction would not be as easy as he thought it would be.

Even more deficient is Murphy's summary of Wedding and Lemann's communications. He asserts that the two attorneys were negotiating "BLI's continued possession of the leased property for month-to-month tenancy," but does not discuss Wedding's testimony that she told Lemann the Davises wanted to purchase the property, and that she had asked for Murphy to do an appraisal. He also leaves out Lemann's

acknowledgment of the option in the lease, and Lemann's July 8 phone call to Michael.

Because Murphy almost completely ignores the evidence supporting the trial court's factual findings, we conclude he has waived any argument based on sufficiency of the evidence.

III.

IN ANY EVENT, SUBSTANTIAL EVIDENCE SUPPORTS
THE TRIAL COURT'S FINDINGS

Even if Murphy's brief had fairly summarized the evidence, we would nevertheless affirm the court's judgment. "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and '"substantial" proof of the essentials which the law requires in a particular case.'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.) "Thus, the focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be 'insubstantial.'" (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.)

A. *Exercise of the Purchase Option*

Substantial evidence supports the trial court's finding that BLI timely and effectively exercised the purchase option in the lease agreement. The lease stated that, so long as BLI was not in default (and it was not), "[t]he Purchase Option may be exercised by delivering written notice to Landlord."

The trial court referenced the discussions Murphy and Michael had prior to the lease's expiration, as well as the fact that Michael hired Wedding to represent BLI in its exercise of the purchase option. Additionally, the court found credible the testimony of Linda, Joanna, and Michael about

13

the drafting, execution, and delivery of the written notice document to Murphy on July 1, well before the lease expired.[10] The court also noted both Linda and Jennifer Simon placed Murphy at the bar on July 1.

The trial court also found BLI's subsequent conduct clearly indicated BLI thought it had exercised the purchase option in a timely fashion. Michael was able to show phone records and a copy of a text message proving that he called and texted Murphy on July 2. The court also thought Lemann's call to Michael on July 8 was prompted by BLI's notice of exercising the option. It did not find Lemann's testimony on the substance of the July 8 call credible. There was plenty of evidence to support the court's finding that the option had been exercised on July 1.

B.      *No Abandonment of the Purchase Option*

Murphy took the position at trial that BLI waived or abandoned its exercise of the purchase option by its later conduct, including its choice to continue paying rent and its attempts to relocate the bar. The trial court also rejected this argument. It observed Wedding had reserved all claims and defenses under the lease in August, and that she and BLI were engaging in multiple different avenues to protect their interests while also attempting to get to an agreement with Murphy to purchase the property. Based on the trial court's finding that BLI timely exercised the option, it was also fair for it to view BLI's later conduct as attempts to see the option through, and to mitigate BLI's damages.

The court's findings are supported by substantial evidence.

___

[10] We note Linda's version of events is bolstered by her testimony that she would typically only hand Murphy a loose check for the rent. July 2020 was the only time she ever put the check into an envelope. This suggests there was more than just a check being delivered to Murphy.

DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.


BANCROFT, J.*

WE CONCUR:


MOTOIKE, ACTING P. J.


DELANEY, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.